A. F. UNDERWOOD, *Appellant,* v. HENRY F. FOSHA et al., *Appellees.*

No. 18,075.

A. F. UNDERWOOD, *Appellee,* v. HENRY F. FOSHA et al., *Appellants.*

No. 18,527.

### SYLLABUS BY THE COURT.

PROMISSORY NOTES — *Fraud* — *Bona Fide Holder* — *Inconsistent Findings*—*New Trial.* In an action upon two promissory notes having the same parties and the same history, judgment was rendered for the plaintiff upon one and denied on the other, apparently upon the ground that one was due and one not due when transferred to him. But the plaintiff relied upon the title of his assignor who received both notes before due, therefore the question whether the assignor was an innocent holder for value in due course was a material matter. Upon this question the findings are inconsistent. On a review of the evidence and findings it is held that the verdict should be set aside and a new trial granted upon both notes.

Appeals from Riley district court. Opinion filed June 7, 1913. Reversed.

*George E. Stoker,* of San Francisco, Cal., and *John W. Newell,* of Topeka, for A. F. Underwood.

*Ira C. Snyder,* and *Harold E. Harlan,* both of Manhattan, for Henry F. Fosha et al.

The opinion of the court was delivered by

BENSON, J.: These appeals are from a judgment in which the plaintiff recovered upon one of two promissory notes, and was denied a recovery upon the other. The notes are for $1333.33 each, dated April 23, 1903, made by Fosha and endorsed by Quantic. They were made payable in nine and twelve months from date, respectively. The recovery was upon the twelve-months note. Special findings were made and a general verdict rendered. The plaintiff moved for judgment on the nine-months note, notwithstanding the

verdict. The defendants moved to set aside certain findings and for a new trial. In origin, transfer and history the notes are identical. The appeals are necessarily considered together.

The Ashurst Land, Oil & Development Company is a California corporation and will be referred to as the company. At the dates involved in the history of these notes its officers were Jacob Simon, president; L. J. Abrams, vice president and general manager; and O. B. Parkinson, secretary. The plaintiff, A. F. Underwood, was a stockholder in the company. He was also in control and management of a general store at Tres Pinos in that state owned by another corporation. Parkinson, the secretary of the company, was a director in the corporation owning the store.

Among other duties Abrams was engaged in selling stock of the company upon a commission of forty per cent. On April 22, 1902, he sold defendant Fosha, at his home in Riley county, a block of this stock in consideration of the two notes in suit. To induce Fosha to purchase the stock and give his notes, Abrams stated that the company had 2776 acres of land for which it had a deed; three oil wells, two of them having oil in them, but they must be drilled deeper for paying quantities; and that it had already expended $45,000. It was proposed and agreed to, that the notes should be made payable to the order of Quantic, who is a neighbor of Fosha, who should hold them until Fosha should be satisfied that the property was all right, and if not satisfied on investigation the notes should be returned.

Relying upon these representations and this agreement, Fosha signed the notes and handed them to Abrams, who promised to deliver them to Quantic. Abrams took them to Quantic and told him that they were made to him to be held until he, Quantic, or Fosha, should make an investigation, and if not satisfied with the investigation, Fosha was to have his notes

49—89 KAN.

back. Quantic said he had no safe place to keep them, whereupon Abrams proposed "If you will sign them over to the company, I will take them out to Stockton and put them in the safe, for safe keeping." Thereupon Quantic indorsed the notes in blank and gave them to Abrams in reliance upon that promise.

In August, 1903, at the request of Fosha, Quantic went to California and investigated the company and its property. He found one hole, so called, where drilling was going on and that the company had a lease of two other wells a mile and a half away, upon which they had not paid anything, out of which they were to have 60 per cent of the oil, if oil should be struck. An expenditure of $45,000 had not been made, but when stock was sold the proceeds were put into the unfinished well. He found that the company had no deeded lands. Quantic reported his examination and its result to Fosha, and told him that it was a fraud from beginning to end, and advised him not to pay the notes. Afterwards Quantic attended a meeting of the directors of the company and inquired for these notes, so held for safe-keeping. The secretary answered, "They are here, Mr. Quantic." Whereupon Quantic demanded the notes and said: "I have investigated this property and found it a fraud from beginning to end." Thereupon the president dismissed the meeting. Quantic then asked for some action and the return of the notes, but the directors at once left. This occurred about October 1, 1903. At this time, also, the secretary read to the board a letter from Fosha demanding the return of his notes. Afterwards, at Fosha's instance, Quantic wrote several letters to the secretary and to Abrams requesting the return of the notes.

On the 11th day of January, 1904, the directors of the company entered into a written contract with W. E. Youle, in San Francisco. The officers of the company were present, and the contract was signed by the president and secretary. Abrams took an active

Underwood v. Fosha.

part in making the contract. It provided that Youle should drill two wells to a depth of 1500 feet (their depth then being over 600 feet) for a consideration of $9000, to be paid by the delivery of the two notes in suit here, a $4000 note made by Quantic, a note of another maker for $1242, shares of the company's stock of the par value of .$1000, and the balance in cash. The notes were forthwith delivered without indorsement. At the same place and on the same date Abrams and Youle entered into what Youle calls a side contract, also in writing, whereby Youle and Abrams became partners in the drilling operations to carry out the main contract, and agreed that the net profits should be divided equally between them, Abrams to advance monthly one-half the necessary expenditure to carry it out, not exceeding $350 per month. At this time neither Youle nor Abrams had done anything upon the contract for drilling, and all the notes were delivered as an advance payment. Youle was acquainted with the company and knew that the Fosha and Quantic notes were given for stock in that company. He testified that he did not consider the company reputable; that it was not customary to receive pay in advance on such contracts; that he was told by the officers that he could negotiate the notes as they were becoming due; and that he considered it a velvet contract. He had asked an Oakland, California, bank to procure a rating on the makers of the notes, and had received a satisfactory report. The nine-months note about to fall due was indorsed by Youle in blank for collection to a local bank. Material was sent out to the wells as soon as the condition of the roads would permit, and on February 26 work was commenced by Youle under his contract. The work was interrupted and soon stopped because of the failure of the oil company to provide casing as it had agreed in the contract to do. Youle, as appears from his testimony, had charged up to the contract $3000 worth of material.

Groceries to the amount of $124 were on the ground. What the material on the way or in warehouse consisted of is not stated, except a cable of the value of $700. The contract was that he was to use the tools, machinery and appliances of the company then on hand, but was to furnish all other tools, appliances and machinery necessary to sink the wells, the rig and permanent fixtures to remain the property of the company.

On January 29, 1904, Abrams, Parkinson and the plaintiff met in San Francisco and talked over a trade in which the notes in suit and the $4000 Quantic note should be sold to the plaintiff for goods. Parkinson, who had previously been authorized by the plaintiff to find a purchaser for the goods, drew up an instrument purporting to be an agreement between Youle and the plaintiff in which the plaintiff agreed to sell these three notes for the stock of merchandise and fixtures in the Underwood store at Tres Pinos, and if the stock at regular invoice prices inventoried more than the amount of the notes to pay the difference in cash or collateral, as might be agreed. The plaintiff signed the contract, which was witnessed by Abrams and Parkinson, and left it with them. Youle did not sign it at that time, and was not present. The notes were not produced and the plaintiff had not seen them. Shortly before this writing was made Abrams had proposed to Youle a trade of the notes "for a nice little business at Tres Pinos." Youle signed the agreement soon afterwards. He testified that Abrams did not represent Underwood in the deal but was anxious to have the contract made. He also testified:

"Q. But did it not strike you a little bit peculiar that the Vice-president and Manager, before you had given any value for these notes, should induce you to enter into a contract to trade the notes to somebody else? A. They knew that I would do that. It struck me only as being peculiar in this way: that they had a lot of confidence in me—that I was all right.

"Q. They knew there was no material on the

Underwood v. Fosha.

ground?    A. Yes, I bought a bill of groceries from Mr. Underwood—124 dollars' worth and that was delivered on the ground.

"Q. There was no material there and not a foot drilled—the drill was not in place?    A. No."

About February 1 Underwood received the contract for the sale and purchase of the goods, signed by Youle, either from Youle himself or by mail.    Youle came to the store on that date, looked over the goods, and accepted an invoice made by the plaintiff the first of the year.    The twelve-months note and the Quantic note were delivered to plaintiff without indorsement, and a written assignment was made of the nine-months note, which was in Kansas, having been forwarded through banks for collection.    Youle gave the plaintiff the report he had obtained from the Oakland bank concerning the responsibility of the makers.    He took possession of the store on February 3, the plaintiff remaining to discharge his duties as postmaster, the office being in the building, and to collect accounts reserved.    The trade was closed February 3.    On February 5 Youle learned that the nine-months note had been taken in Kansas by replevin.    The secretary and president of the company and Mr. Abrams, the manager, were examined at length touching its property and holdings, but little definite information was obtained, although it appeared that the company did not own 2776 acres of land; nor does it appear what land it ever owned in fee except 160 acres standing in the name of Abrams.    After many evasive answers, the secretary was asked:

"Q. Have they any tools or fixtures of any kind belonging to them upon their holdings at this time?    A. I can not say.    I have not been down there for some time.

"Q. Who is in charge there, if anybody?    A. Why, Youle is the man that I left in charge there; he was the last man that had charge of that.

"Q. How long has he been gone? A. I do not know."

After many questions concerning real estate, the secretary said:

"A. I will tell you what I know, Mr. Clark, in that regard, as near as I can.

"Q. Go right ahead. A. The Ashurst Oil Land and Development Company has an option to purchase land on which it has been paying $50 a month for a matter of three years past or more. It has received deeds, and they are on record, your searcher to the contrary notwithstanding. If he did not find them, he is no good. I want that in the record, so that he will see it—to oil rights.

"Q. The record shows that? A. Not to the fee simple title; to the land itself, including everything in it; to various portions and pieces of land down there in addition to fee title lands before testified to. Now, just what those lands are and just how many acres, I am unable to state. Your abstract, if it is correct, will show the number of acres. The company also has filed locations by its agents to a number of different locations, and deeds have been made of those locations. They also have a contract with the Hamiltonian Oil Company, by which they get an interest, amounting to about one-third interest in that company and its lands —just the number of acres I am unable at the present time to state.

"Q. Is that all? A. There is a piece of land, I think 160 acres—I am not positive about that, that was deeded to Mr. Abrams for the benefit of the company in San Benito county from Henry D. Grayson. . . . And this land in Shasta county was also purchased, and the deed taken in Abrams' name for the benefit of the company, and was afterwards sold for the benefit of the company. The company has spent a good many thousand dollars in the doing of assessment work on these located lands."

Mr. Youle testified that he had found the representation of the oil company that it had 2776 acres of land to be false. This, however, was after he had entered into the contract for drilling and had taken the notes.

The Quantic note for $4000 was made by Quantic for stock in the company, payable to the order of A. G. Cress to be held by the payee until the maker should have an opportunity to investigate the holdings of the company, and if not satisfied to be returned, substantially the same as in this case except that the nominal payee was Cress in the one case, and Quantic in the other. When Quantic made the investigation before stated he did so for himself as well as for Fosha. The delivery of the Quantic note in violation of the trust by Abrams and its subsequent history is the same as the notes in suit here. An action upon that note by Underwood resulted in findings and judgment for Quantic, affirmed by this court. (*Underwood v. Quantic,* 85 Kan. 111, 116 Pac. 361.) When this case was called for trial, the defendant asked leave to amend his answer by pleading the judgment in the Quantic case as a former adjudication, but the motion was denied.

The following findings, among others, were made by the jury in this case, viz.:

"Would Fosha have executed the notes if Abrams had not agreed that Quantic should hold them until Fosha could satisfy himself as to the representations made by Abrams? A. No.

"Were the notes in fact placed in Quantic's hands pursuant to such agreement? A. Yes. . . .

"When Youle acquired the notes on January 11, 1904, did he know that Fosha or Quantic had any defense to the payment of the notes? A. We think not. . . .

"Did Youle acquire the notes on January 11, 1904, in good faith or in bad faith? A. We think in good faith.

"When Underwood acquired the notes on February 3, 1904, did he know that Fosha or Quantic had any defense to their payment? A. He should have known they had a defense against the nine months' note, as it was eleven days past due when purchased.

"Did Underwood acquire the notes on February 3, 1904, in good faith or in bad faith? A. We think so, in good faith.

"Was defendant Henry Fosha induced to sign the notes in suit through fraud and fraudulent representa-

tions of the Ashurst Oil, Land and Development Company, or its officers and agents? A. Largely so.

"Did Fosha, either by himself or through other persons, make an examination of the oil fields and the holdings of this company, and was he dissatisfied and demand his note back from the oil company? A. Yes.

"Did Abrams, the general manager of the Ashurst Oil, Land and Development Company, obtain the notes in suit from Quantic with the understanding that the oil company was to keep said notes and in case Fosha demanded them back from Quantic they would return them to Quantic? A. Yes.

"Did the Ashurst Oil, Land and Development Company transfer the notes in suit to Youle, and if so, was this transfer in good faith? A. We think so,

"Did Youle transfer the notes in suit to plaintiff, A. F. Underwood, and if so, was the transfer in good faith? A. Yes.

"At the time of the purported transfer of said notes from Youle to Underwood, was Underwood acting in good faith? A. We think so.

"In the making of the pretended sale between Underwood and Youle, was Parkinson acting as the agent of Underwood? A. Yes.

"At the time of said pretended sale, did Parkinson, as the agent of Underwood, have actual knowledge that the notes in suit had been obtained by fraud from Fosha? A. Yes."

The plaintiff's motion for judgment on the nine-months note on the findings is based on the finding that Youle, from whom he received it, was a holder in good faith. He invokes the proposition that a purchaser for value either before or after maturity, although with notice of a defense, may enforce collection, provided his assignor was an innocent purchaser. The rule is:

". . . But a holder who derives his title through a holder in due course, and who is not himself a party to any fraud or illegality affecting the instrument, has all the rights of such former holder in respect of all parties prior to the letter." (Gen. Stat. 1909, § 5311.)

The defendants meet this proposition with the contention that the findings to the effect that Youle was an

innocent purchaser are contrary to all the evidence and should have been set aside on their motion.

The jury appears to have imperfectly understood the meaning of the term good faith in such transactions, or were confused in its application. They say by affirming the recital in question 26 that Abrams was the general manager of the company, and about this there was no dispute; that he undertook to hold these notes subject to an investigation, to be returned to the maker on demand; and in answer to question 31, they say that Parkinson, the plaintiff's agent, had actual knowledge that the notes were obtained by fraud from Fosha. Parkinson, it must be remembered, was the secretary of the company as well as agent for the plaintiff.

It is a legal impossibility that notes so held by the company, or its general manager, upon the conditions stated, could have been transferred by either in good faith. If the jury had the same conception of the term when they found that Youle took the notes in good faith, the impropriety of ordering a judgment on that finding, notwithstanding the general verdict, is readily apparent.

Passing from the findings to the evidence, it is undisputed that when the defendants' representative reported the result of the investigation and the resulting dissatisfaction to the company and demanded the return of the notes, the directors' meeting summarily adjourned, although the secretary then stated that the company still held the notes. After this they were transferred to Youle, as already stated, not by Abrams alone, but it seems by the action of the directors. Not only is the finding that the company made the transfer in good faith contradicted by other findings, but by the undisputed evidence.

Bearing upon the good faith of Youle, whose rights are invoked by the plaintiff as his transferee, it will be noticed that the notes were negotiated by Abrams, the

general manager, and by the company in flagrant violation of an agreement to hold them for a specific purpose. Youle, when he received them, knew that they had been given for the company's stock and that the company was not reputable, and took them as an advance payment for work not yet commenced, contrary, as he admits, to usual custom, and on the same day took the general manager into partnership to perform the very contract upon which he received them. By the assistance of his partner, the general manager, and Parkinson, the secretary of the company, he hastened to trade the notes for a stock of goods, signing the contract for exchange before he had seen the goods or the purchaser. These and other conditions already stated present a situation different from those ordinarily existing when commercial paper is transferred to one claiming the protection of an innocent purchaser and make the findings concerning good faith highly important. But in view of the conclusion reached, further comment on the facts will not be made.

In consideration of the evident misunderstanding or misapplication of terms used in the findings, and the contradiction therein, the case should be tried again. The issues upon the two notes are not distinguishable, except as to date of maturity. The plaintiff, however, relies upon the good faith of his assignor as to both notes and the new trial should embrace both. The principles upon which new trials are allowed or refused upon inconsistent findings are stated in *Anderson v. Pierce,* 62 Kan. 756, 64 Pac. 633, and have been applied in many cases. Where from inconsistencies in the findings upon a material matter a sound basis for a judgment does not exist, a new trial should be allowed. (*Edwards v. Railway Co.,* 86 Kan. 257, 119 Pac. 872.)

The court did not err in refusing to allow an amendment to the answer to plead former adjudication. In the absence of any further showing it was a matter of discretion to permit such an amendment on the eve of

the trial. Besides, no estoppel appears. While the Quantic note and those in suit here were made in similar transactions, they were made to different payees, at different times, and upon distinct sales of stock, in one case to Quantic and in another to Fosha.

The judgment is reversed and the cause remanded with directions to grant a new trial.