No. 19,623.

A. F. UNDERWOOD, *Appellee,* v. HENRY F. FOSHA and HENRY QUANTIC, *Appellants.*

### SYLLABUS BY THE COURT.

1. APPEAL—*Findings of Jury Conclusive.* Rule followed that a finding of the jury upon sufficient and competent testimony is conclusive on appeal.

2. SAME—*Findings Not Inconsistent.* Findings of fact examined and found not inconsistent.

3. PROMISSORY NOTE—*Innocent Holder.* When promissory notes pass into the hands of an innocent holder for value before maturity all equitable defenses are cut off; and although the assignee of such holder had notice of the original infirmities of the notes, he takes by assignment all the rights of his assignor, and can recover on the notes whether he acquires them before or after maturity.

4. TRIAL—*Form of Special Questions.* Special questions examined and found unobjectionable, following chapter 239 of the Laws of 1913.

5. SAME—*Additional Instructions.* It is not error for the trial court, after a jury has deliberated on a case for two days, to give an additional instruction.

6. SAME—*Instructions Not Erroneous.* Refusal to give requested instruction examined and found not erroneous.

7. SAME—*Remarks of Counsel—Not Reversible Error.* Where a lawyer from a distant state closed his argument to the jury by extending to them and to the trial judge an invitation to visit his state and promised to make their visit pleasant, it is held that such remarks, while improper, do not constitute reversible error.

Appeal from Riley district court; SAM KIMBLE, judge. Opinion filed July 10, 1915. Affirmed.

*Hal E. Harlan,* of Manhattan, and *Ira C. Snyder,* of Denver, Colo., for the appellants.

*John W. Newell,* of Topeka, and *George E. Stoker,* of San Francisco, Cal., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This case was here before (*Underwood v. Fosha,* 89 Kan. 768, 133 Pac. 866). The comprehensive statement there made need not be repeated.

It is an appeal from a judgment of the district court of Riley county in favor of A. F. Underwood, the holder of two promis-

Underwood v. Fosha.

sory notes executed by Henry F. Fosha, and deposited by him with Henry Quantic to be delivered to the Ashurst Oil, Land and Development Company, a California corporation, for stock in that company when Fosha had satisfied himself as to its property and prospects. The corporation was one of the blue-sky type, probably a little worse than common. Quantic was duped into a surrender of the notes by L. J. Abrams, the company's general manager, and they passed into the hands of one W. E. Youle in consideration of his doing some oil boring for the company, and Youle traded the notes to plaintiff Underwood for a stock of goods in Tres Pinos, Cal., at some distance from the field of operations of the oil company. About the time Youle received the notes, he and Abrams formed a partnership to do the well-boring for the company, and the notes were, in effect, a payment in advance for his work, and Abrams was on both sides of the contract. He knew of the infirmity of the notes. One O. P. Parkinson negotiated the deal between Youle and Underwood, and was paid for his services as Underwood's agent. Parkinson was one of the organizers of the oil company, and served as its attorney and secretary. He knew of the infirmity of the notes. He and Underwood were jointly interested as organizers and directors of a corporation which was organized to conduct the store which Youle acquired for the notes. Underwood was also a stockholder in the oil company.

Both notes were acquired by Youle before maturity, and when they were transferred by him to Underwood one was not due and the other was slightly past maturity.

It would impose on our credulity too much to ask us to believe that these notes of a Kansas farmer had passed from hand to hand in good faith in the usual course of commercial trade in the far off state of California; but the jury never suspected that anything was amiss and gave judgment for the plaintiff. And our jurisdiction is limited to a review of errors of law. Let us see what errors are assigned: 1. That the evidence does not sustain the finding that Youle was a purchaser in good faith. 2. Inconsistency in the findings of the jury. 3. That notice of the infirmities in the notes to Parkinson was notice to his principal Underwood. 4. That the special questions were illegal in form. 5. That the trial court erred

in voluntarily giving an instruction after the jury had deliberated for two days on the case.· 6. Error in refusing an instruction as to the effect of Parkinson's knowledge of the fraud. 7. Misconduct of counsel.

Touching these in order:

· . (1) The great difficulty in dealing with the first error assigned is that it asks us to trench upon the recognized province of the jury. There was ample evidence to justify the jury in finding that Youle was not a purchaser in good faith. But, on the other hand, there was also the asseverations of Youle to the contrary. Has not the jury settled the question?

. "Question 3. Did Youle acquire the notes on January 11, 1904 in good faith or in bad faith? If you find that he acquired them in bad faith, then state in detail in what his bad faith consisted? Answer. Good faith."

Not a month goes by that this court does not have to repeat the elementary rule that the supreme court can not substitute its· judgment for the judgment of the jury on an issue of fact upon which there is conflicting testimony. Counsel can not seriously expect us to violate the fundamentals of appellate procedure in this respect.

. (2) Are the following findings inconsistent?

"Q. 7. When Parkinson negotiated the trade between Youle and Underwood was Parkinson engaged in a scheme to defraud Underwood? A. No.

"Q. 15. Did the Ashurst Oil, Land and Development Company transfer the notes in suit to Youle, and, if so, was this transfer in good faith? A. They did, in bad faith.

"Q. 17. At the time of the· purported transfer of said notes from Youle to Underwood, was Underwood acting in good faith? A. Yes."

. Parkinson, as an officer of the oil company and privy and confederate in the fraud upon Fosha, participated in the transfer of the notes from the oil company to Youle. He was also the paid agent of Underwood in effecting the trade of Underwood's stock of goods to Youle for the Fosha notes. But wherever this decision may eventually lead, the findings complained of are not subject to criticism.

. (3) Did Parkinson's knowledge of the infirmities of the notes bind his principal? This is the crux of this lawsuit. There is a well-established rule of law that knowledge of the agent, not acquired in the course of the agency and not in the mind of the agent at the time of a transaction made by him in

behalf of his principal, does not bind the principal. It is also the rule, at least the prevailing and more logical one, that knowledge and notice of the agent acquired prior to his agency but which was clearly in the mind of the agent at the time of the agency transaction does bind the principal. Both sides of the rule are thus stated in Cyc. by Professor Goddard in his article on Principal and Agent:

"The duty of an agent to inform his principal of all material facts is a duty which the law conclusively presumes that the agent has performed, and a principal is therefore affected with knowledge of all material facts of which the agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, although the agent does not in fact inform his principal thereof. Conversely a principal is not affected with knowledge which the agent acquires while not acting in the course of his employment, or which relates to matters not within the scope of his authority, unless the agent actually communicates his information to the principal." (31 Cyc. 1587.)

"While the general rule is that notice received by an agent during his agency is notice to the principal, its operation is sometimes held to be narrowed by the condition that not only must notice be received during the existence of the agency, but that notice to bind the principal must be received by the agent while engaged in the particular transaction to which the information relates, and that notice to the agent in a prior disconnected transaction, although for the same principal, will not charge the latter. If, however, the agency is continuous as distinguished from an agency involving distinct transactions separated by considerable periods of time, knowledge acquired by the agent at one period of the agency will charge the principal in a subsequent transaction by the same agent in which the knowledge is material. Knowledge acquired by an agent in a prior transaction will not affect the principal in a subsequent transaction in which the agent does not represent him.

"On the question whether a principal is chargeable with knowledge acquired by an agent prior to the existence of his agency the authorities differ widely, some holding that in order to charge the principal the knowledge must be acquired by the agent during the agency, and that knowledge acquired prior thereto will not affect the principal. The more logical rule, however, and that which is supported by the great weight of recent authority, is that knowledge of an agent acquired prior to the existence of the agency will be chargeable to the principal if it be clearly shown that the agent, while acting for the principal in a transaction to which the information is material, has the information present in his mind, and if the information was not obtained under such circumstances as to make it the legal duty of the agent not to divulge it to the principal." (31 Cyc. 1592.)

In the case entitled *The Distilled Spirits,* 78 U. S. 356, it was held:

"The rule that notice to the agent is notice to the principal applies not

only to knowledge acquired by the agent in the particular transaction, but to knowledge acquired by him in a prior transaction and present to his mind at the time he is acting as such agent, provided it be of such a character as he may communicate to his principal without breach of professional confidence." (Syl. ¶ 5.)

This is a most instructive case. It traces the doctrine to English sources, but we can only take space to quote part:

MR. JUSTICE BRADLEY.—"The question how far a purchaser is affected with notice of prior liens, trusts, or frauds, by the knowledge of his agent who effects the purchase, is one that has been much mooted in England and this country. That he is bound and affected by such knowledge or notice as his agent obtains in negotiating the particular transaction, is everywhere conceded. But Lord Hardwicke thought that the rule could not be extended so far as to affect the principal by knowledge of the agent acquired previously in a different transaction. (*Warrick v. Warrick*, 3 Atkyns, 291.) Supposing it to be clear, that the agent still retained the knowledge so formerly acquired, it was certainly making a very nice and thin distinction. Lord Eldon did not approve of it. In *Mountford v. Scott* (1 Turner & Russell, 274), he says: 'It may fall to be considered whether one transaction might not follow so close upon the other as to render it impossible to give a man credit for having forgotten it. I should be unwilling to go so far as to say that if an attorney has notice of a transaction in the morning, he shall be held in a court of equity to have forgotten it in the evening; it must in all cases depend upon the circumstances.' The distinction taken by Lord Hardwicke has since been entirely overruled by the Court of Exchequer Chamber in the case of *Dresser v. Norwood*, 17 Common Bench, n. s., 466. So that in England the doctrine now seems to be established that if the agent, at the time of effecting a purchase, has knowledge of any prior lien, trust, or fraud, affecting the property, no matter when he acquired such knowledge, his principal is affected thereby. . . . On the whole, however, we think that the rule as finally settled by the English courts, with the qualification above mentioned, is the true one, and is deduced from the best consideration of the reasons on which it is founded." (pp. 366, 368.)

(See, also, the recent case, *Hess v. Conway*, 92 Kan. 787, 142 Pac. 253.)

We have therefore the highest sanction for the converse doctrine, that knowledge or notice of the agent prior to the agency and clearly in the mind of the agent at the time of the agent's transaction for his principal is binding on the principal.

In this case there is not the slightest room for doubt that the agent had knowledge of the infirmities of the notes in mind. He had helped to accomplish the fraud. The plaintiff himself offered to prove his agent's duplicity.

What effect does this have upon Underwood's right to re-

cover upon the note which was not due when the acquired it? The jury found that Youle acquired it in good faith. (See, also, *Youle v. Fosha,* 76 Kan. 20, 90 Pac. 1090.) It is the law that where commercial paper passes through the hands of an innocent holder, the assignee under him takes it free of all infirmities although he may himself be fully apprised of them. (Negotiable-instruments act, § 65, Gen. Stat. 1909, § 5311; 1. Daniel on Negotiable Instruments, 6th ed., § 803.) It follows that Underwood can recover on the note which he obtained from Youle, the innocent holder, before its maturity.

It seems also to be the law that since the past-due note had passed through innocent hands before its maturity, and thus was freed from equitable defenses, it is of no consequence that one who acquires it after its maturity may have had notice of its original infirmities; such last owner can recover on it and does not have to meet equitable defenses. The doctrine has a logical basis. If a third party can not take commercial paper from an innocent holder free from equitable defenses because such third party knows of its original infirmities, then the rights of the innocent holder are greatly restricted. His market for such paper would be limited to those who like himself had no notice of its original infirmities. Since the innocent holder could collect from the maker, it can make no difference to the maker into whose hands the note may pass. (7 Cyc. 790.)

In 1 Daniel on Negotiable Instruments, 6th ed., it is said:

"But there is this limitation to this doctrine; that if the holder acquired paper after maturity, from one who became a *bona fide* holder for value and without notice before maturity, he is then protected by the strength of his transferrer's title." (§ 782.)

In *Lill v. Gleason,* 92 Kan. 754, 142 Pac. 287, Mr. Justice Burch said:

"Section 65 of the negotiable-instruments law merely affirms the settled principle of the law merchant that when a negotiable instrument once passes into the hands of a holder by indorsement in due course the maker's right to interpose defenses good against the payee is cut off as to all subsequent holders not parties to fraud or illegality affecting the instrument. The reason is that if a holder in due course could not invest his transferee with his own capacity to recover on the paper his property rights would be materially and prejudicially reduced." (p. 757.)

This is all settled law. Of course, if the note should come back into the hands of the original payee, or an assignee under

him who had notice of the equitable defenses and who had owned it before it passed into the hands of an innocent holder, the original equitable defenses could be maintained. But that is not this case.

(4) Exception was taken to the form of the special questions. Any one of these will illustrate:

"Question 3. Did Youle acquire the notes on January 11, 1904 in good faith or in bad faith? If you find that he acquired them in bad faith, then state in detail in what his bad faith consisted? Answer. Good faith."

The objection to this form of question is not clear. Lawyers and judges know that juries are not always fair. They are also inclined sometimes to overlook controlling details in a lawsuit; and as a corrective the legislature has authorized the submission of special questions, and their number and scope are within the sound discretion of the trial judge. (Laws 1913, ch. 239.)

(5) After this cause was submitted and the jury had deliberated upon it for two days, the court voluntarily gave them another instruction. The practice is not altogether rare; it should be used with great circumspection, for the obvious reason that jurors who have deliberated long upon a case will be apt to seize on a belated instruction and give it more than its proper proportionate significance. We do not find, however, that the practice has been condemned. In 38 Cyc. 1849, it is said:

"The court may exercise a wide discretion in the matter of charging the jury, and may of its own motion recall the jury and give them additional instructions, or give such instructions when they return to court and report that they are unable to reach an agreement. It has been held that the court may exercise this power, even though the jury say that they do not want any further instructions; and after the jury has announced that they have agreed upon a verdict the judge may send them out again with further instructions before receiving the verdict."

(6) The defendant asked an instruction to the effect that if Parkinson, the plaintiff's agent, had in mind the fraudulent acquisition of the notes from their maker at the time he negotiated the transfer of the notes from Youle to plaintiff, that Parkinson's knowledge would bind his principal. Since Youle was found to be an innocent holder, the refusal to give the instruction in the desired form was not error.

(7) Yet another error is urged. In concluding his argument before the jury, counsel for plaintiff, a California lawyer, said:

"Now, gentlemen of the jury, at this time, on the part of the state of California as a state, and on the part of the city of San Francisco, and on the part of myself, I want to tender to each of you and to the honorable judge of this court, individually, a very cordial invitation to attend the exposition in 1915, and if any or all of you gentlemen should come to this great fair I will be delighted to see you and do anything in my power to make your visit pleasant."

Such remarks were not proper, but they could hardly be said to be so prejudicial as to require a reversal. Moreover, they do not appear to have been excepted to, nor brought to the trial court's attention on a motion for a new trial. And while we are mentioning this we might add that we have been considerably handicapped in reviewing this case for want of the pleadings and a formal specification of errors as prescribed by the rules of this court.

This disposes of the matters raised on this appeal, and no reversible error appearing, the judgment must be affirmed.