No. 20,316.

FREEMONT RODGERS, *Appellant*, v. O. R. SLAVENS, *Appellee*.

SYLLABUS BY THE COURT.

1. ACCOUNT STATED—*When Incorrect*. An account stated is incorrect when it fails to state all the items of credit to which the debtor is entitled.

2. SAME—*Verified Denial—Issues*. It is proper to deny under oath the correctness of an account stated, although the items of debits and credits therein set forth are not disputed, where the defendant's contention is that the account stated does not contain all the credits to which he is entitled.

3. PROMISSORY NOTE—*When Law of Contract Controls*. Between the original parties to a promissory note, where no rights of holders in due course are involved, the ordinary principles of the law of contracts control.

4. SAME—*Mistake in Signing as Maker Instead of Indorser—Evidence*. Where no rights of holders in due course or of other innocent parties without notice are involved, it may be established by clear, decided and satisfactory proof that the signing of a promissory note as maker was a mistake, and that the signing as an indorser was intended.

5. SAME—*Trial—Judgment Affirmed*. The pleadings, evidence, special findings and verdict in an action between original parties to a promissory note examined, and the judgment affirmed.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed June 9, 1917. Affirmed.

*Carr W. Taylor*, of Hutchinson, *John H. Connaughton*, and *H. E. Walter*, both of Kingman, for the appellant.

*Frank L. Martin, Van M. Martin*, and *Howard S. Lewis*, all of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff, Freemont Rodgers, brought this action against the defendant, O. R. Slavens, in three counts, and the trial court's judgment on the first and third of these is the subject of this appeal.

The first count alleged that the defendant was indebted to plaintiff as the assignee of an account stated for services, business transactions and expenses, in the sum of $1547.64, due from defendant to a commission firm in Kansas City of which plaintiff was a partner.

The third count was based on a promissory note for $20,-409.41, signed by J. D. Rawlins and O. R. Slavens, and indorsed by Freemont Rodgers. Plaintiff alleged that he had indorsed this note at the request of Slavens, before delivery, as an accommodation indorser, and that Rawlins and Slavens had failed to pay the note when due, whereby plaintiff was compelled to pay and did pay, and that the note was sold, transferred and delivered to him, and that it was due and unpaid.

In his answer to the first count, defendant denied the correctness of the account stated, and denied that he was indebted to plaintiff. Certain features of the transactions involved in answer to the third count were relied upon to show that defendant owed nothing on the account stated, and the verification was, "that the allegations in said answer denying the correctness of the account set forth in plaintiff's petition are true."

Slavens' defense to the promissory note, in substance, was that in September, 1911, he and Rodgers purchased 800 steers in El Paso for $26 per head, Rodgers having arranged for all the purchase funds through a Kansas City bank, except the sum of $1142, which the vendor of the cattle owed Slavens. A bill of sale for the cattle made by the vendor to Slavens was immediately assigned to the bank. The cattle were shipped for Kansas City, but unloaded for rest and feed in Dalhart and there sold for $30 per head to J. D. Rawlins, a wealthy citizen owning a stockyard at that place. One of the terms of the deal was, that if the cattle were sold before the first day of the following January at a profit Slavens was to get a share of

the profit. If not sold by January 1, Slavens was to have no further interest in the cattle. Rodgers negotiated a loan for $20,409.41 from the Kansas City bank for Rawlins to pay for the cattle—the balance of the purchase price being in cash. The bank required that Rodgers should indorse Rawlins' note, and Rodgers wrote to Slavens requesting him to indorse it also. Parts of the correspondence between the parties may be noted:

[Slavens to Rodgers, October 10, 1911.]

"Major Rawlins and I are here at the Springs this morning and I talked with him more fully about the cattle he bought. He says the paper is to be made to him individually as he understood it, and whatever interest I want in the cattle shall be a silent interest. I did not know whether you understood this or not, so I am writing you and if it is satisfactory you can take out my money along with yours. I told Major I would want one-third interest. He says if the cattle is not sold in ninety days he wants the exclusive right and ownership of them, but in case they are sold in ninety days, I can have one-third of the net profits," etc.

[Rodgers to Slavens, October 12, 1911.]

"Yours of Oct. 10th, from Colo. Springs received have followed your instructions in regard to making paper to Rawlings and send same to 1st National Bank, Dalhart for him to sign and have instructed the bank to forward same to you and when received, *please endorse on back of note and return to me.* Bank requires me to do same, and as you are a silent partner in the deal, you can have no objections to endorsing."

When the Rawlins note was forwarded to Slavens for his indorsement he was confined to his bed with sickness and incompetent to transact business, and his bookkeeper brought it to him, and through misunderstanding he signed the note on its face as a maker, when he was only requested by Rodgers to sign as an indorser. The bank, however, in its correspondence with Slavens about the note recognized Slavens as an indorser, referring repeatedly to the "Rawlings' note on which you are indorser," and the "note of J. D. Rawlings indorsed by you."

The defendant Slavens pleaded, and the evidence which he produced tended to prove that Rodgers retained his interest in the cattle when they were sold to Rawlins. It seems clear that Rodgers was a principal on the original indebtedness incurred for the purchase of the cattle. On cross-examination he testified:

Rodgers v. Slavens.

"Q. Didn't you write Mr. Slavens a letter on the 15th of August, 1911, in which you said, 'I will make all necessary arrangements to pay for the cattle.' A. Apparently I did.

"Q. So you did on the 15th of August, 1911, say to Mr. Slavens in this letter, 'I will make all necessary arrangements to pay for the cattle as they are put on board cars and furnish money to carry remainder of the bunch until such time of sale.' A. Yes sir."

Other features of the evidence were, that the freight bill on the cattle from El Paso to Dalhart was $1600; that in the presence of a witness, who was the president of a Hutchinson bank, a conversation occurred at the sick bed of Slavens, where Rodgers explained that he was the owner of a half interest in the cattle sold to Rawlins, and that the interest of Slavens, which was the $1142 which he had advanced on the original purchase price, and his share of the profits by the sale to Rawlins, $800, should be paid to the Hutchinson bank for the benefit of Slavens. To another witness Rodgers asserted that he had a half interest in the cattle. Rodgers received all the cash paid by Rawlins; Slavens none.

In addition to the general verdict on each count for defendant, there were special findings made by the jury:

"7. Did Slavens sell an interest in said Cameron's cattle to J. D. Rawlings? Ans. Yes.

"8. Did Slavens and J. D. Rawlings execute said note for $20,409.41 to the Interstate National Bank as makers? Ans. They did; but evidence shows that Slavens should have signed as an indorser.

"9. Did the Interstate National Bank require Freemont Rodgers to sign said note on the back thereof as an accommodation indorser before extending the credit to O. R. Slavens and J. D. Rawlings, the comakers of said note? Ans. Yes."

The plaintiff contends, first, that he was entitled to an instructed verdict for $1547.64 on the account stated in the first cause of action, because it was clearly proved and not contradicted. Slavens did not dispute any item of the account, but he denied its correctness, and it apparently was incomplete—therefore incorrect—for it entirely omitted to give Slavens credit for the $1142 which he furnished to purchase the cattle. It omitted also Slavens' share of the profits of the sale of the cattle to Rawlins. Rodgers and Slavens sold them to Rawlins at an advance of $4 per head, which on 800 cattle would be $3200, and after deducting $1600 for the freight

charges would leave $1600 as the net profit, one-half of which belonged to Rodgers and one-half, $800, to Slavens. The sum of $1142 and $800 is $1942, and as Rodgers exclusively managed the fiscal end of the transaction, and it does not appear that Slavens ever laid hands on any of the money, it would seem that this sum would be a proper set-off against Rodgers' demand against Slavens for $1547.64 as far as they equaled each other. (Civ. Code, §§ 97, 100, 102.) There was, therefore, nothing due on the first count, and it can not be conceded that the jury disregarded the pertinent instruction of the court covering that phase of the case. Fault is found with the instruction itself, in that it assumed "that there were controverted facts to be decided by the jury as to whether anything was due on the account." But the correctness of the account was in issue, and it was shown to be incorrect in that it omitted the items constituting the set-off.

It is next contended that plaintiff was entitled to judgment on the third count on the special findings of fact, and that the special findings are inconsistent with the general verdict. We discern no inconsistency. Rodgers was one of the original parties, a principal, in the entire series of transactions relating to the purchase of the cattle, the financing of the deal, the profits, the sale to Rawlins, the obtaining of credit for Rawlins, the receipt of Rawlins' cash payment, and in the procuring of Slavens' signature to the note. He only requested Slavens to sign as an indorser. That Slavens signed as a maker by mistake did not alter his real status as an indorser, although if the bank had claimed to hold the note without notice of Slavens' mistake and had sought to enforce it against him as maker it could have held him as such. But it did not do so. It repeatedly recognized and admitted, in writing, that his relation to the note was that of an indorser. Nor did Rodgers occupy the position of one taking under a holder in due course without notice. Rodgers never was a stranger to the transaction, but was a maker and principal throughout, and when he paid the note he paid his own debt; or, speaking more accurately, he paid the debt of himself and Rawlins. Such payment discharged the note. (Gen. Stat. 1915, § 6647.) The cases of *Lill v. Gleason,* 92 Kan. 754, 142 Pac. 287, and

*Underwood v. Fosha*, 96 Kan. 240, 150 Pac. 571, cited by plaintiff, are not pertinent to the facts here presented.

Where no intervening equities exist, and no rights of strangers or others holding in due course are affected, and only those of original parties are concerned, no question peculiar to the transfer of negotiable paper is involved (*Bank v. Clarke*, 99 Kan. 18, 21, 160 Pac. 1149), and there is no principle of law which bars the defense pleaded and proved by Slavens. The ordinary principles of the law of contracts control. (8 Cyc. 25-28; 17 Cyc. 694; 3 R. C. L. 1118, 1120.) The plea of Slavens that it was by mistake that he signed the note as maker instead of as an indorser was supported by proof sufficient to satisfy the most exacting rules of evidence as to the degree and quality of proof necessary to maintain such a defense. (*Parker v. Hull*, 71 Wis. 368, 5 Am. St. Rep. 224.)

No substantial error is disclosed and the result seems in accordance with justice, and the judgment is affirmed.