STATE OF WEST VIRGINIA *v.* BOYD ANDERSON

(No. 8298)

Submitted January 14, 1936. Decided March 24, 1936.

*Morton & Wooddell* and *Wysong & Wysong*, for plaintiff in error.

*Homer A. Holt*, Attorney General, and *Kenneth E. Hines*, Assistant Attorney General, for the State.

WOODS, JUDGE:

Boyd Anderson, who was arraigned on the charge of having murdered his brother-in-law, William Duncan, complains of a judgment of the circuit court of Webster County, entered on a verdict of voluntary manslaughter, sentencing him to confinement in the penitentiary for a period of five years.

The altercation, in which Duncan was fatally wounded, occurred at the home of Bud Anderson, on Sunday, July 8, 1934, about 8:30 P. M. Bud Anderson and wife had gone to Buckhannon that day and had not yet returned. The defendant, age thirty-one, the oldest child, and half-brother to the rest of the children, remained at home, with certain minor children, including Ivy, fourteen years of age. It appears that defendant's room was a sort of hallway for the remainder of the house—the bedroom occupied by his half-sister Stella, and her husband, William Duncan, to whom she had been recently married, opened into it at a point directly opposite the doorway leading into the living-room. Stella and her husband, who

had been away that afternoon, returned a short while before the trouble, being accompanied by the latter's nineteen year old brother, Harold Duncan. The three went into Stella's room. Defendant, then working at the barn, saw the party arrive. Ivy was either called into the bedroom at Harold's request, or went in voluntarily. The door was later locked.

Defendant testified that while in the house on some mission, he heard Ivy scream "to get her away from that man"; that, believing his sister in danger of being despoiled, he ran into his room, and finding Stella's door locked, demanded that the same be opened; that upon a second demand being unheeded, he stepped into the living room and took a pistol off the wall; that after a third demand, he fired into the floor in front of the door; that the door opened, and Ivy ran out into another part of the house; that Stella, William and Harold, in the order named, rushed out and attacked him; and that there was no light in his room except that which filtered through from Stella's room, the latter being lighted by a "toy" lamp. He testified that he, at all times, believed himself to be in danger of great bodily harm; that the first two shots after the door opened (one of which struck Stella in the hip and the other in the breast) were fired to bluff his assailants into withdrawing from their attack; that thereafter he fired wherever he could; that the third shot struck Duncan, who was up close when the same was fired; and that Harold escaped from the house. William Duncan and the defendant, according to the latter, had been good friends; and defendant denies the existence of any ill will toward the former.

According to the state, Stella appeared in the doorway following Ivy's exit, and dared defendant to shoot; and after being shot in the leg, came out into defendant's room and struck him in the face three times, at which time she received a shot in the breast. William insisted that they hadn't done anything, and was shot and fatally wounded while pleading for his wife's life.

Defendant contends, among other things, that he has

been particularly prejudiced by the 'court's action in re-calling the jury, after they had deliberated the greater part of two days, to-wit, Saturday and Monday, and re-reading the instructions, as modified. It appears that the defendant had offered an instruction (No. 9) on volun-tary manslaughter, but the same was refused. So the case originally went to the jury under instructions for both the state and the defense on first and second degree murder and self-defense. The state's instructions in-formed the jury as to the sentence attached to murder in first and second degrees. Upon the second charge, the court withdrew defendant's No. 7, dealing with second degree murder, and in lieu thereof, read No. 23A, which injected the issue of voluntary manslaughter into the jury's future deliberations. The original and substituted instructions are in words and figures following:

No. 7—"The court instructs the jury that be-fore you can find the defendant guilty of murder in the second degree you must believe from all the evidence and beyond all reasonable doubt that the defendant Boyd Anderson wilfully, de-liberately and maliciously shot and killed the de-ceased William Duncan. Each of the elements of wilfulness, deliberation and malice must be proved from all the evidence and beyond all rea-sonable doubt by the State, before the crime of murder in the second degree is established; and unless these elements have been so established from all the evidence and beyond all reasonable doubt, you shall find the defendant not guilty of murder in the second degree."

No. 23A—"The court instructs the jury that if they shall find from the evidence that the kill-ing was done without malice, in the heat of pas-sion in a sudden brawl or affray, on a sufficient provocation such killing amounts to voluntary manslaughter only, and the jury should so find; if, however, you find that the killing was done in the heat of passion, but on a slight and insuf-ficient provocation, and you further find, from a preponderance of all the evidence in the case that the killing was neither reduced below mur-

der in the second degree nor excused on the ground of justifiable self defense, although done in the heat of passion, the offense amounts to murder in the second degree, and the jury should so find, and if you find the offense has been so lowered you shall find the appropriate verdict, and if excused on the ground of justifiable self defense find the defendant not guilty."

It is insisted that the foregoing substitution, in view of the circumstances, amounted to a direction to return a verdict of voluntary manslaughter; and, further, that this was particularly true since, under the instructions as originally given, counsel had been deprived of the right of arguing whether the jury would be warranted in finding defendant guilty of volutary manslaughter.

As a general rule it is within the province of the court to recall the jury and give them further instructions, when in the exercise of a proper discretion it regards it necessary to do so in the furtherance of justice. 16 C. J. 1087, sec. 2553. Our statute (Code 1931, 56-6-19, *et seq.*) does not purport to limit the court's province in this regard. However, "the practice * * * should be used with great circumspection, for the obvious reason that jurors, who have deliberated long upon a case, will be apt to seize on a belated instruction and give it more than its proper significance." *Underwood* v. *Fosha,* 96 Kan. 240, 150 Pac. 571, 574. Or, as stated by another court: "The natural tendency of calling the attention of the jury specially to a certain legal principle upon which the case of one of the parties may especially depend is to magnify in the eyes of the jury any evidence which may have been adduced which is pertinent to that particular principle, and to stress the contention of one party, who may have relied upon it, to the manifest injury to the opposite party." *Musgrave* v. *State,* 5 Ga. A. 467, 63 S. E. 538.

While recognizing the propriety of repeating a part of a charge upon request of jury, it was held error in *Swaggerty* v. *Caton,* 48 Tenn. 199, 202, to repeat or re-

charge a disjointed portion of the charge where a jury merely disagrees as to the result, since "a jury very well may, and we think always will conclude, that the court means to have them understand that the matter or question thus disjointedly charged upon, is controlling in the case."

In the case of *People* v. *Stouter*, 142 Cal. 146, 75 Pac. 780, the jury were instructed that they could return one of two verdicts, namely, "Guilty as charged" or "Not Guilty." After a twenty-four hour deliberation, they were instructed that they might find as a third form of verdict that the defendant was guilty of an "attempt" to commit the crime charged. This was held to be error. Applying the pertinent portion of that court's reasoning in the last-mentioned case to the instant one: Some of the jurors may have believed the evidence too slight to convict defendant of either first or second degree murder, and, for the purpose of argument, may have admitted that he might have been convicted of manslaughter if the instruction had allowed it, and after the second charge containing the element of voluntary manslaughter, may have been embarrassed by their former admissions. And, again, they might very well have considered the inclusion of an instruction on voluntary manslaughter as an indication of the desire of the court that the defendant be convicted of some offense. Jurors exhausted by a long confinement, and naturally desirous of being released, are not in a suitable frame of mind to thoroughly consider an entirely new phase of the case under a new instruction which might fairly be construed as an expression of the court hostile to the defendant.

Thus, it becomes apparent that the jury, in the absence of an admonition that the inclusion of the element of voluntary manslaughter was not intended as an opinion of the court on the weight of the evidence, must have been unduly influenced by the substitution of No. 23A. It virtually told the jury, in the absence of such an admonition, that they should compromise their differences by a verdict of voluntary manslaughter, and was, therefore, prejudicial error.

Defendant also complained of the refusal of his instruction No. 5, which instructed upon the necessity of the jury being of unanimous opinion that the defendant was guilty and that it was the duty of a juror not to surrender his own convictions simply because other jurors are of different opinion. *State* v. *McKinney,* 88 W. Va. 400, 106 S. E. 894; *State* v. *Wisman,* 94 W. Va. 224, 118 S. E. 139. Ordinarily such instruction, if asked for, should have been given. However, it appears that the jury was instructed "that before a conviction can be had in this case, the jury must be of the *unanimous opinion* that the defendant Boyd Anderson is guilty beyond a reasonable doubt." This instruction of the court brought to the attention of the jury the question of their unanimity. So we do not believe it was error to refuse No. 5.

Defendant asked for the giving of a number of instructions, which included statements relative to his right to defend his sister against debauchery and rape. We are of opinion that these instructions were properly refused, since it is admitted on the part of the defendant that his sister had left the room and gone into another part of the house before the alleged attack on defendant. The instruction given in lieu of No. 14 (dealing with the above matter), while not incorporating defendant's contention, did properly advise the jury that since the defendant had in his possession the pistol, which he had secured when he thought his sister was in danger of being ravished, that the "fact that he was so armed for that purpose at the time of the shooting would account lawfully for the possession of the weapon, and in such circumstances the jury should not regard the possession of the weapon as a circumstance against him." This was most favorable to the defendant under the circumstances of the case.

Numerous objections were lodged to remarks made by the trial court during the course of the trial. Many of these remarks were inconsequential and did not amount to error. And, in many instances, the trial court, upon objection, cured the error, if any, by proper admonition

to the jury, which action of the court seems to have been accepted by counsel.

For the error heretofore discussed, the judgment of the circuit court is reversed, the verdict of the jury set aside, and a new trial granted the defendant.

*Judgment reversed; verdict set aside; new trial awarded.*