Scott v. King.

---

No. 19,687.

J. P. SCOTT, *Appellant*, v. THOMAS J. KING, as Executor, etc., et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. PRACTICE—*Amendment to Pleadings—Judicial Discretion.* Rule followed that the allowance or refusal of belated amendments to pleadings is within the sound discretion of the trial court.

2. SAME—*Findings on Conflicting Evidence Conclusive.* Rule followed that the trial court's findings of fact will not be disturbed on appeal when based upon substantial though conflicting testimony.

3. TRIAL—*No Error in Record.* Suggestion of trial court's abuse of discretion examined and found groundless.

4. NEW TRIAL—*Failure to Present Excluded Evidence in Motion.* Rule followed that where excluded evidence is not brought forward and presented on motion for a new trial as prescribed by section 307 of the civil code, the denial of a new trial on account of such excluded evidence is not error.

Appeal from Bourbon district court; CHARLES E. HULETT, judge. Opinion filed November 6, 1915. Affirmed.

36—96 KAN.

*J. I. Sheppard, James G. Sheppard,* and *Kate Sheppard,* all of Fort Scott, for the appellant; *A. M. Keene,* of Fort Scott, of counsel.

*John L. Connolly,* and *John H. Crain,* both of Fort Scott, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action in the district court of Bourbon county wherein the plaintiff, J. P. Scott, sought to enforce an oral contract between him and Thomas Chapman and Lucy Chapman, his wife, by which Chapman and wife agreed that Scott should have a life estate in Chapman's farm in consideration of Scott and his family moving on the farm and caring for Mr. and Mrs. Chapman in their old age.

Thomas Chapman and his wife, Lucy Chapman, lived for many years on a Bourbon county farm. It appears that the wife of the plaintiff was a frequenter of the Chapman home in her childhood and girlhood; that the plaintiff worked for Chapman when he was a young man; that the plaintiff and his wife were married about the year 1875 in the Chapman home, and resided with the Chapmans for about three months; that some years later Scott and wife resided with the Chapmans about a year, and after a lapse of a year the Scotts took up their abode with the Chapmans again for about a year, after which a house was built on the Chapman land in which the Scotts lived for about seventeen years; then the Scotts moved to a neighboring farm, residing there for some time; and during all these years the relations of the Scott and Chapman families were friendly and intimate.

In December, 1903, Chapman and his wife were visiting at the Scott home, and in the presence of Scott and his wife, and their grown daughters, and Mrs. Lucy Chapman, Thomas Chapman said:

"Q. Now state all that was said there by anybody there in the presence of Mr. and Mrs. Chapman? Just what was said and who said it? A. Mr. Chapman said to my father: 'Well Scott, we want you to come back on the place. We want someone we can depend upon, and see that we are cared for in our old days, and if you will come back, I will build another room on the house down there for you and fix it all up for you, and you are to pay me one-third (⅓) of the annual crop, and one-half (½) of the hay. You are to repair the fences and I will

furnish the repairs, and in regard to the pasture, you are to have all the pasture excepting what I want for my horse and cow, if I keep them, and the orchard, you are to have all the fruit that you want to use, and I reserve the pieplant patch and my garden, and you are to have your private garden, and if you will come back and stay with us until we are dead, the home will be yours and Mahala's (Mrs. Scott).'

"Q. What else was said, and by whom? A. And my father says: 'Well, you have writings drawn up to that effect and I will come back,' and he says, 'There is no use to have writings, for I know you and you know me, and I know you will do what's right, and you know I will do what's right, so father told him he would come." (Testimony of Alma Scott.)

The Scott family returned to the Chapman farm in the spring of 1904, residing in a house near the Chapman residence, and this situation between the parties continued until the death of Thomas Chapman in 1906. Prior to his death Scott and his wife and children did various little services for Thomas Chapman; these might be construed as part of the alleged oral contract between the parties or as mere courtesies and reciprocal civilities between lifelong friends.

Soon after the death of Thomas, his widow, Lucy Chapman, went to California. There is testimony that before her departure she told Scott and his wife that she had made provision for them in her will. She returned from California in March, 1907, and lived in the Scott home for two weeks. Then she requested the Scott family to move into her home, saying:

" 'I can not live alone—I want you to move in with me and maintain a home for me. When I am through with it, the home goes to you and Mr. Scott or to Mr. Scott and Mahala.' " (Testimony of Mrs. Scott.)

About this time the Scott family moved into the Chapman home with Mrs. Lucy Chapman. She was by that time a very old woman; she was feeble and afflicted with cancers. She is said to have told the plaintiff frequently:

"Scott, you go ahead with the place just the same as you did in Mr. Chapman's lifetime, for when I am through with this, it belongs to you and Mahala."

And to Mrs. Scott:

"Mahala, you will be well paid for what you do."

Scott and his wife and children continued to render Mrs. Chapman the small courtesies and civilities they had rendered to Thomas Chapman in his lifetime. The testimony tends to

show many such services. Mrs. Scott assisted the old lady in cooking, sweeping, dressing and undressing, and dressing her cancers; the Scott family carried in fuel and water for her, occasionally built her fire, made her bed, waited on her when sick, never left her alone at night, and the like services continued until her death in 1912 at eighty-three years of age.

The foregoing summarizes briefly the main evidential facts upon which J. P. Scott bases his claim to a life estate in the Chapman farm.

On the other hand, the record shows that Mrs. Lucy Chapman made a will in 1910 disposing of all her property to relatives. It also shows that on March 1, 1911, J. P. Scott and Mrs. Lucy Chapman mutually executed an ordinary lease for the farm in question for the term of one year, with all the usual recitals, and fixing the rent at $200, the half of which was to be paid in advance and acknowledged as paid. It also provided that the plaintiff, J. P. Scott, would peaceably surrender possession, without further notice, on February 28, 1912. The lease also reserved to the landlady, Mrs. Lucy Chapman, "her living room and the building her things are stored in," and also provided:

"Seventh. That in case of sale of said premises during their occupancy by said second party, and purchaser should desire possession, said second party hereby agrees to give up to said purchaser said premises at once, on payment to him of a fair and reasonable compensation for the crops which he may then have in the ground, and if he and the purchaser cannot agree to the amount of such compensation, it shall be left to three disinterested appraisers, of which said second party shall choose one, the purchaser one, and these two shall choose a third one. Their decision shall be final as to the amount to be paid by purchaser to said second party."

The record also shows that for the last two or three years of her life Mrs. Chapman paid the Scotts for the eggs and milk she consumed (probably from the date of her will); that she paid for her washing and ironing; and at one time she said, as testified by Mrs. Scott:

"Well, of course, when she came back from town here, why, of course, she was feeling bad, and I, of a morning, I would go in and carry her breakfast in to her, for she did n't feel like getting up and cooking anything for herself, and she told me, 'Mahala, if you are going to bring me my victuals, you might as well bring me all of my victuals and I will pay

Scott v. King.

you for it,' and she said she would pay me two dollars a week for doing her cooking for her, and I cooked her meals and carried them to her for ten months before she died."

Other more or less significant circumstances were the filing in the probate court of claims by plaintiff and wife against the Chapman estate for sums of $1352 and $1690 respectively for work and labor. Later these claims were withdrawn, or dismissed by order of the probate court.

The cause was submitted to a jury, which could not agree on a verdict, and they were discharged. Thereupon the defendants moved for judgment on the pleadings and evidence. The plaintiff asked leave to amend his petition and this was denied. The court sustained the motion of defendants and gave judgment in their favor, and made a special finding of fact "that there was no contract between J. P. Scott, plaintiff, and Thomas Chapman and Lucy Chapman as alleged in plaintiff's petition."

The plaintiff assigns error:

"1. In refusing to permit plaintiff to file amendment to his petition on March 25, 1914, and to thereby amend his petition.

"2. In rendering judgment in favor of defendants and against plaintiff.

"3. In overruling plaintiff's motion for a new trial."

1. Did the court err in refusing to permit the plaintiff to amend his petition, to plead alleged services of himself and wife in behalf of Thomas Chapman from March 1, 1904, until August 7, 1906, the date of the death of Thomas, and like services to Lucy Chapman during the same period, and like services for Lucy until her death in 1912, that plaintiff had furnished certain wire, staples and nails to the value of $14.10 for the Chapman farm, with the consent and approval of Thomas and Lucy Chapman, and that plaintiff had furnished milk for three years to Thomas and Lucy Chapman of the value of $27.37, and eggs of the value of $30?

It is familiar law that the allowance or refusal of belated amendments to pleadings is within the sound discretion of the trial court. (*Bank v. Badders*, ante, p. 533, and cases cited therein.) The proposed amendment was presented to the court on March 25, 1914. The case was called for trial on January 29, the evidence introduced and the cause submitted to the jury January 31, and the jury discharged for disagreement on February 2. On February 10 the defendants' motion for judg-

ment was filed. The same day the court gave plaintiff until March 25 to prepare and submit his proposed amendment, and upon its submission it was denied.

This is very far from an abuse of discretion, when we keep in mind that the court at that time was in possession of all the facts and at the same time determined upon those facts that there was no such contract as alleged between the plaintiff and Thomas and Lucy Chapman in their lifetime, and when it is considered that the subject matter of the proposed amendment had once been the basis of a claim against the Chapman estate in the probate court and withdrawn and dismissed. It is impossible for this court to hold that the refusal to allow this belated amendment was error.

Appellant quotes many precedents where parol contracts for the conveyance of land have been enforced by this court. (*Smith v. Cameron,* 92 Kan. 652, 658, 141 Pac. 596, and cases cited.) But the difficulty here lies in the trial court's finding of fact that there was no contract, as alleged by plaintiff. Moreover, it is elementary law that a court of appeal can not disturb a finding of fact, based upon sufficient though conflicting evidence. (*Martin v. Hoffman,* 77 Kan. 185, 93 Pac. 625; *Heath v. Life Association,* 89 Kan. 634, 132 Pac. 147; *Underwood v. Fosha,* ante, p. 240, 242, 150 Pac. 571.)

The doctrine of abuse of discretion is mentioned. Its application could only be pertinent if this court had some serious misgiving that there had been a probable miscarriage of justice in the district court. Apparently the trial court, which saw the plaintiff and his wife and daughters on the witness stand and heard their story, did not believe it. We have only the printed pages of a record before us, and it would be presumptuous and unusual for this court to substitute its judgment for the judgment of the district court on the credence to be given to their testimony, in view of the many circumstances which tended to disprove their asseverations.

2. What has been said in reference to the first error assigned is equally pertinent on the second. A general finding for the defendants on the issues and free from positive and prejudicial error can not be disturbed.

3. On the third assignment, it is urged that the court should have permitted the children of the plaintiff to testify as to their

Scott v. King.

services for Thomas and Lucy Chapman. That at best would have been merely cumulative. Enough was admitted to prove that there were such services. The record reads:

"Q. Did your father or mother, or what are the facts as to whether or not your father or mother ever requested you, or the other children in your presence, to go over to the Chapman residence any time before Mr. Chapman died? A. He did—"

Counsel for defendants:

"Objected to as incompetent, irrelevant and not within the issues.

"The court: Objection sustained."

Counsel for plaintiff:

"Judge, this seems to me to be perfectly plain, and perfectly within the issues. We have certainly got a right to show what this plaintiff did in looking after these people. They don't have to do these things personally. If they keep their children going over there and keep looking after them right along, that's within the issues and that is within the pleadings. Or, if he sent some hired man or hired a man to go up there, it would be the same proposition. We certainly have to show that in order to show our good faith. . . .

"The court: Ask your next question."

(Testimony of Alma Scott.)

It does not readily appear how this could have been material. The issue was on the existence of an oral contract for a life estate in a farm. Moreover, the motion for a new trial does not show that the excluded evidence was brought to the attention of the trial court, as the statute provides. This is imperative. Section 307 of the civil code provides:

"In all cases where the ground of the motion (for a new trial) is error in the exclusion of evidence . . . such evidence shall be produced at the hearing of the motion by affidavit, deposition or oral testimony of the witnesses."

(*Cooper v. Greenleaf*, 84 Kan. 499, 114 Pac. 1086; *Greer v. Mercantile Co.*, 86 Kan. 686, 121 Pac. 1121; *Clark v. Morris*, 88 Kan. 752, 129 Pac. 1195; *Walter, Adm'r, v. Calhoun*, 88 Kan. 801, 805, 129 Pac. 1176; *Caldwell v. Modern Woodmen*, 89 Kan. 11, syl. ¶ 3, 130 Pac. 642; *Thompson v. Thompson*, 94 Kan. 168, 171, 146 Pac. 344; *Broady v. Fire Association*, 94 Kan. 245, 248, 146 Pac. 343; *O'Neal v. Bainbridge*, 94 Kan. 518, 524, 146 Pac. 1165.)

We have labored through the voluminous abstracts and studied the briefs of counsel with diligent care, but find nothing approaching reversible error therein, and the judgment is therefore affirmed.