No. 23,415.

THE STATE OF KANSAS, *Appellee,* v. CHARLES E. BALL, *Appellant.*

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Homicide—Excluded Evidence Not Produced on Motion for New Trial—No Error Predicated Thereon.* The rule that proffered testimony excluded at the trial must be brought on the record in support of the motion for a new trial by affidavit, deposition or oral testimony, before it can be made the basis of reversible error, is the same in criminal as in civil cases, and unless the excluded evidence is thus submitted, no error can be predicated thereon—following *The State v. Wellman,* 102 Kan. 503, 512, 170 Pac. 1052.

2. SAME—*Homicide—When Self-defense is Available to a Defendant.* In a prosecution for homicide the trial court's instructions correctly declared that the law does not permit an aggressor who provokes a difficulty with his adversary, and slays him in the course of it, to invoke the right of self-defense unless the aggressor, after provoking the difficulty, withdraws from the combat in such a way as to show his adversary his intention to desist.

3. SAME—*Homicide—No Prejudicial Error Discerned in Record.* The record, including the instructions given and refused in a prosecution for murder, where the defendant was adjudged guilty of manslaughter in the third degree, examined, and no error prejudicial to defendant discerned therein.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed February 11, 1922. Affirmed.

*S. B. Amidon, S. A. Buckland, H. W. Hart, Glenn Porter,* all of Wichita, *E. E. Elliott,* of Wellington, and *S. P. Ridings,* of Medford, Okla., for the appellant.

*Richard J. Hopkins,* attorney-general, *James Lawrence,* county attorney, *E. J. Taggart, John Bradley,* both of Wellington, and *A. M. Jackson,* of Winfield, for the appellee.

The opinion of the court was delivered by

DAWSON, J.:   Charles E. Ball shot and killed Adam Baker, and under a prosecution for murder Ball was convicted of manslaughter in the third degree.  Ball appeals, assigning error in the rejection of evidence and in the instructions.

The evidence for the state as shown by the plaintiff's counter abstract, none of which is abstracted by the defendant, discloses that Ball had a family consisting of a wife and three children, who resided in Caldwell.   One of these children was a daughter of 22 years; there was a son of 19 years, and the youngest, a lad of 13 years.   Ball was on bad terms with his wife and had not lived with her for about a year, but he continued to support his family.   Adam Baker, who was about fifty-two years old, had been paying his addresses to the daughter, but Mrs. Ball disapproved of this because of the disparity in their ages, so Baker transferred his attentions to Mrs. Ball herself.  He sometimes accompanied her home from church, and there was evidence from which, rightly or wrongly, it might be inferred that an unduly intimate and immoral relationship existed between them.   While Ball was in the western part of the state, he received word of the intimacy of Baker and Mrs. Ball, and returned to Caldwell, but not to his own home.  He got in touch with his son, the boy of 13 years, and arranged that the latter should notify him when Baker was at the home.  Ball hid in the barn to learn what information he could about the presence of Baker, and eventually arranged with his son that he, Ball, would watch behind a tree near the house and the lad was to tell him when Baker was about.   One evening in February, 1920, while Mrs. Ball and Baker were on the porch, the defendant came upon them.   Defendant ordered them both into the house.  Baker had on his overcoat, cap, gloves and overshoes and he entered the house and seated himself as he was ordered.  The defendant then ordered two young lady boarders to leave for the night, saying, "Girls, you get another room for the night.   There is going to be talk here that is not fit for you to hear."   The counter abstract of Mrs. Ball's testimony from this point proceeds thus:

"After he had told them to hurry, she [Mrs. Ball] started up and tried to speak to the girls, and Ball told her to step back and pushed her back.  After the girls left, Ball asked Baker what he was doing there, and Baker said he was there as a neighbor and friend.  Ball told him he was a liar, and he would not lie any more.  Ball cursed Baker, and called him a 'son of a ——' and

said he was going to send him to hell. Ball then asked Baker if he walked home from church with her, and Baker said he had a few times; then Ball said he would not walk home with another man's wife and pointed a pistol in his face. Mr. Baker was just in the act of rising from the chair, when Ball fired. Baker was neither clear in the chair, nor was he up. Ball was three or four feet from Baker when he fired. Baker had just moved to get out of the chair when the first shot was fired. When the second shot was fired Baker had taken one step and raised his right arm in front of his face to kind of protect himself. When the third shot was fired Baker took a couple of steps, stepping around, and when the fourth shot was fired she did not know whether Baker got into the room known as the parlor, or whether Ball fired before Baker stepped into the room.

"After the fourth shot fired, Baker fell right in the front door between the kitchen and parlor. His head struck in the door, and all of his body in the parlor. He was going in the direction of the parlor when the fourth shot was fired.

"She said further: 'I begged Mr. Ball to stop shooting, and he pointed the pistol at me and told me to shut up or he would shoot me, and stated, "Your family is all that saved you." He then directed Lloyd to go for the marshal, and while the boy was gone Ball said something about killing Baker. I do not recall just what it was, and then I said to him, 'But what will they do with you,' and Ball said, 'I have all that planned.'"

The defendant testified at length in his own behalf. He enlarged upon the circumstances which tended to show the infidelity of his wife in connection with Baker. The counter abstract of defendant's testimony reads:

"While in western Kansas he got an anonymous letter; that he has made a diligent search for the letter and is unable to find it. He then stated that the contents in substance was: 'You had better come home. Some one is coming there you had better look out for.' . . . That in December, 1919, he met Baker on the street in Caldwell and that he asked Baker why he was going to his place so much for, and Baker said he was not, and he then told Baker, 'You are, and I want you to stay away.' . . .

"He also stated that when he came around the house that he saw Mr. Baker standing with his wife on the back porch and he had his arm around his wife. When they saw him, Baker dropped his arm from around her. He also stated that he said, 'Hello, Mr. Baker, are you having a talk,' and that Baker did not say anything. Then he stated that he said, 'Let's go in the house.' That he did not shove nor touch Baker before going in the house. When they got in the house he told Baker to sit down. . . . He said to Baker, 'What are you coming to my house so much for?' Baker said, 'I have only been here a couple of times.' Then he does not remember whether he called him a liar just then or a little more was said. He also stated that he knew that Baker had been there many times, and the boy not only had told him about his coming, but all he had seen; that he [Ball] himself had seen Baker there many times. He called Baker a liar, and he knew he was a liar when he said he had only been there two times. He then asked Baker

what he had been walking home from the church with the woman so much for, and Baker said he had only walked home with her twice. He thinks it was then he called Baker a son of a ——. . . .

"He also stated that when he called Baker a son of a ——, Baker got off of the chair and that he, the defendant, was standing by the corner of the table, and he came in a circle towards the defendant. When he slid off the chair, it was in a crouching position, and he started towards the defendant, and then it was that the defendant shot, which he presumes is the shot that hit the chair. He claims he did not shoot at Baker, but shot to stop him; that he was afraid of Baker, and thought Baker would do him some great bodily harm, or take his life; that while Baker was sitting in the chair he had his right hand in his overcoat pocket, and that after he came towards the defendant he was in a crouching position; that Baker, after the first shot, kept coming, and then the defendant shot again and Baker kept coming. He was still coming in a crouching position and by that time Baker was striking at him, and he then shot the third time. And then the defendant stepped back around the corner of the table, because he was afraid of Baker, and then it was he shot the fourth shot. He was closer to Baker at the third shot than at the fourth shot. He also claims that it was necessary to make these shots in order to stop Baker, and that he honestly believed that if he had not shot he would have received great bodily harm or death."

## On cross-examination, defendant testified:

"He admitted that he bought the pistol on Saturday before the shooting on Monday. That he and the boy were riding around on Saturday; that he had made his mind up during the day to buy this pistol, but it was sometime in the afternoon on Saturday that the pistol was purchased. That he had told his boy that he would watch around for Baker and for the boy to keep him posted as to when Baker was there. He also admitted that after the purchase of the pistol it was his intention to catch Baker at his house. . . .

"He claimed the reason he wanted to catch Baker at his home was to stop him, and in his judgment, a pistol would be necessary, as a man going to his home as Baker had, he felt it his duty to look out for him. He believed that he would be in danger, when he caught Mr. Baker in his home; that a difficulty would result in his catching him there. He also stated that a man going to his home, as Baker was, would do anything, and then he stated: 'I would have been a fool to have went, if I was not prepared to protect myself.' He stated that he believed that when he caught Mr. Baker that Baker would likely do him some great harm, and that he got this revolver in anticipation that some difficulty or altercation might ensue that would necessitate him to have a pistol to protect himself. . . .

"That after he called Baker a lying son of a ——, Baker started to get off of the chair, and then it was that he become satisfied that he was not going to have a quiet, peaceable time with Baker. That at no time did Baker fire any shots, nor did he see Baker have any pistol, nor did he see Baker have anything in his hand. The defendant simply claimed that he did not see one in his hand or on his person, but he was afraid of Baker. He stated that he did not know even if Baker had had a pistol whether or not he would have fired

while the defendant was firing at him. He stated that he was from eight or nine feet from Baker when he fired the first shot, and he was asked if it did not occur to him that if Baker had a pistol that he would have fired at the defendant after the defendant's first shot, and his only answer was, 'I don't know what that man might have.' He stated that he was afraid of Baker, because a man caught in that position was liable to do anything, and therefore he pulled the pistol and fired at Baker. He was then asked that if Baker was a desperate man, and going to do him great bodily harm, or take his life, if he did not think after he fired at Baker that if Baker had had a pistol that he would have fired at the defendant, and his only answer was, 'Well, I may and I may not—did not think one way or the other about it.' He also stated that he was not doing much thinking."

Touching the errors assigned in the rejection of testimony, those matters are not in shape to be reviewed. To illustrate: a witness for the defendant was asked—

"Q. You may state to the jury what Adam Baker said he would do if he was caught in the Ball home. . . .

[Objection sustained.]

[Counsel for defendant]: "We desire to show by this witness that in the fall of 1919 and late winter of 1919, at the mill, someone of the employees of the mill said to Adam Baker that he'd better be careful and not go to the Ball home or he might get slugged there, or words to that effect, and that Adam Baker said: I ain't afraid of Ball or anyone else, I will take care of myself; I will take care of myself if I get caught there, I am not afraid of man, God nor the devil, I will fix Ball if he comes there.

"To which the State objects for the reason that it is incompetent, irrelevant and immaterial.

"Sustained."

Counsel for the state make the point that this evidence was properly excluded because these alleged statements of the deceased had not been communicated to the defendant until after the homicide. Be that as it may, the rejection of this tender of evidence cannot be the basis of error. What the witness would have testified to was never disclosed. It was not produced in evidential form as an affidavit, deposition, nor upon oral examination when the motion for a new trial was presented. The want of this is not supplied by an oral address of counsel to the trial judge, saying: "Your honor, we want to show this, that, or the other thing by this witness." The statement of counsel as to what he can prove if permitted to do so will not suffice for the evidence itself. All the rejected proffers of evidence complained of in this appeal are subject to this infirmity. In *Elliott v. Oil Co.*, 106 Kan. 248, 251, 187 Pac. 692, it was said:

"The evidence was excluded—erroneously, no doubt, but yet excluded.

What was the proper course to pursue? It was to produce such proof orally or by affidavits in support of his motion for a new trial."

(Civ. Code, § 307.)

This rule is the same in criminal as in civil cases. (Crim. Code, §§ 209, 219, 282; *The State v. Brower,* 75 Kan. 823, 824, 88 Pac. 884.)

In *The State v. Wellman,* 102 Kan. 503, 512, 170 Pac. 1052, it was said:

"Complaint is made of the exclusion of evidence, but at the hearing of the motion for a new trial it was not produced. The section of the criminal code enumerating grounds for the granting of a new trial does not refer to the rejection of evidence. (Gen. Stat. 1915, § 8191.) Such a ruling is available in support of a motion for a new trial in a criminal case only by virtue of the provision making the procedure of the civil code applicable thereto. (Gen. Stat. 1915, § 8124; *The State v. Keleher,* 74 Kan. 631, 87 Pac. 738.) The provision of the civil code requiring excluded evidence to be produced at the hearing of a motion for a new trial, if it is to be relied upon (Gen. Stat. 1915, § 7209), therefore applies here, and the ruling complained of is not reviewable."

Error is also assigned on the instructions, which were to the effect that where a person is the aggressor and provokes the difficulty in which he kills his adversary he cannot invoke the right of self-defense to excuse or justify the killing, unless he, after provoking the difficulty, withdraws from the combat in such a way as to show his adversary his intention to desist. Part of such an instruction objected to reads:

"And if you believe from the evidence in this case that the defendant deliberately planned to have an interview with the deceased at the home of the defendant with reference to the deceased's relations with defendant's wife, and that the defendant anticipated such an interview might bring on an altercation and a possible necessity of killing the deceased, and therefore armed himself for such interview, and that thereafter he found the deceased upon the porch of his home and in pursuance of the aforesaid plans the defendant instead of ordering the deceased to leave his home, ordered him into his house and commanded other occupants to leave the house and commanded the deceased to sit down, and after the deceased was in the house of the defendant, the defendant drew a revolver and used profane language towards deceased and otherwise villified him when he was seated, and fired a shot at him when he was either in the chair or in the act of getting out of it, and that by reason of the acts of the defendant an altercation ensued from which the defendant did not in good faith abandon said altercation, which resulted in the death of the deceased, then in that event the defendant was the aggressor and he cannot invoke the right of self-defense."

This and the other instructions complained of, and likewise those refused, have been carefully examined. They disclose no error, and

as a whole those given were a fair and favorable statement of the law so far as concerned the defendant. There was no evidence that defendant at any time ceased to be the aggressor; there was no evidence that he was at any time in danger at the hands of his victim; there was nothing in the evidence which could be distorted into a rational theory of self-defense to explain or justify the homicide; the defendant's victim was captured, taunted and slain like a rat in a trap, yet the court very considerately and at length instructed the jury touching the law of self-defense.

It is only because this case is one of homicide that we allow it so much space. There is no doubt of defendant's guilt. The record shows a case of what was virtually murder after arming, preparation, and lying in wait; it was almost confessedly so; yet the defendant has escaped with the meager penalty attached to manslaughter in the third degree.

Affirmed.