No. 24,128.

LABAN E. HARMON, *Appellant*, v. HELEN GERTRUDE HARMON, *Appellee*.

SYLLABUS BY THE COURT.

1. ACTION FOR DIVORCE—*Infidelity of Wife Committed with Connivance and Consent of Husband.* While a husband who suspects his wife of infidelity may, without connivance, and merely to test the accuracy of his suspicions and to secure proof of her delinquency, permit her in a single instance to take advantage of an opportunity to indulge her adulterous disposition; yet when he both knowingly and passively suffers her to keep late hours and dance in the dark and go riding in an automobile with a married man, while he himself dances, keeps late hours and similarly goes automobile riding at night with the wife of the man with whom his own wife is infatuated, and when such unusual intimacy on the part of the four persons concerned continues almost every night for many weeks until the wife is seduced by such other man, this long continued course of conduct and bad example on his part, together with his continued friendly association and comradeship with her seducer after his discovery of their delinquency are evidential circumstances from which a trial court may make the deduction that the adultery of the wife was committed with the knowledge, connivance and consent of the husband.

2. SAME—*Reprehensible Conduct of Husband.* Even if the husband's long-continued passive conduct and his own bad example do not strictly rise to the gravity of connivance, such conduct as outlined in section 1 of the syllabus was so far at variance with proper decorum and general moral standards of propriety that, notwithstanding his wife's lapse into adultery, a divorce was not erroneously denied to the husband.

3. SAME—*Excluded Testimony.* The exclusion of testimony cannot be the basis of reversible error unless it is presented in some proper form in support of a motion for a new trial.

4. SAME—*Custody of Minor Child.* The record examined, and no error disclosed in the trial court's decree that "until the further order of the court"

the defendant mother should have the custody of her infant daughter, notwithstanding the mother's temporary lapse from virtue in her infatuation for another man.

Appeal from Montgomery district court; Joseph W. Holdren, judge. Opinion filed July 8, 1922. Affirmed.

*Chester Stevens,* of Independence, for the appellant.

*Thomas E. Wagstaff, S. H. Piper,* and *W. B. Grant,* all of Indpendence, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action by a husband against his wife, in which he charged her with adultery, and the relief prayed for was a divorce and the custody of their five-year-old daughter.

The trial court found the woman guilty of adultery, but that it was committed "with the knowledge, connivance and consent of the plaintiff," and denied the divorce. Until the further order of the court, the child was entrusted to the care of its mother, except that the father should have its custody three months each year in vacation time. Defendant was also allowed alimony in the sum of $100 per month.

The plaintiff appeals, complaining of this judgment in all its parts; and to determine its justice and propriety, the outstanding features of the evidence will have to be narrated at some length.

In 1915, the plaintiff, Laban E. Harmon, then a reputable young man of twenty-four years, married the defendant, Helen Lewis, in Quincy, Ill. She was about twenty-one years old, a member of a good family, a church member, and Sunday-school attendant. On their marriage they came to live in Independence, Kan., where the plaintiff had a responsible position as accountant for a large corporation. In time a daughter was born. Gradually they enlarged their circle of acquaintances, and acquired the esteem of the community. The plaintiff husband became prominent in lodge circles and the defendant wife attended church, brought her infant daughter to Sunday school regularly, and worked as a substitute teacher. She was a good housekeeper and much attached to her child and saw to its cleanliness, neatness and manners with marked attention. Thus launched and thus conducted the marriage craft of this couple bade fair to achieve life's voyage with a minimum of rough weather. After a time, however, they met another young couple, Mr. and Mrs.

Daugherty, who moved in the same social circle. The Harmons and the Daughertys became friends and frequent visitors in each other's homes. Their intimacy became in time so close and constant that almost every evening they were together. The Harmons were "Laban" and "Helen" to the Daughertys, and the latter were "Bill" and "Bonnie" to the Harmons. They danced, attended picnics, and went auto riding together. Bill usually danced with Helen; Laban with Bonnie. In the automobile, the plaintiff usually drove and Mrs. Daugherty rode in the front seat with him. The defendant and her child and Mr. Daugherty rode in the rear. In their homes, at late hours of the night the plaintiff and Mrs. Daugherty often sat on the porch while defendant and Mr. Daugherty danced inside in the dark to the music of the phonograph. Sometimes they sat outside while the plaintiff and Mrs. Daugherty danced inside under the same circumstances. Laban and Bonnie liked the same kind of dances—waltzes; while Helen and Bill preferred "fox trots." At times the plaintiff and Mrs. Daugherty went auto riding late at night, while the defendant stayed at home to put the child to bed, and Mr. Daugherty stayed with her. Again, it would be the defendant and Mr. Daugherty who would go riding together, leaving plaintiff and Mrs. Daugherty at home. And thus the intimacy of the two couples grew, until it passed all reasonable bounds. At length, the plaintiff, according to his testimony, conceived the idea that defendant had violated her marital fidelity with Mr. Daugherty. He suggested this to Mrs. Daugherty. She avowed her disbelief in anything of the sort. Plaintiff and Mrs. Daugherty, when auto riding at night by themselves frequently argued this matter; and after some weeks of such discussion, in which the existing intimate association of the four did not alter or abate in any respect, plaintiff and Mrs. Daugherty determined, as they say, to test the questioned relationship of Mr. Daugherty and Mrs. Harmon. Late one night plaintiff and Mrs. Daugherty announced that they were going for a ride; they got in the automobile and drove rapidly around a short block, and returned to the house and surprised Mr. Daugherty and Mrs. Harmon in adultery. Then there were tears of the young women, of course; and they and the young husbands discussed what should be done. It was agreed that the incident should not be made public, that Mrs. Harmon should go back to her parents in Illinois, that she should renounce the custody of her little daughter, and

waive all her rights in her husband's property. Laban and Bill thereupon, the same night, about two o'clock a. m., went to Daugherty's office and this agreement was reduced to writing; and Mrs. Harmon signed it. The families spent the remainder of the night together, took their meals next day together and spent the ensuing night together. Then Mrs. Harmon and the child went to Quincy, Ill. From there she wrote piteously to plaintiff to forgive her, begged to be taken back to her husband's affection and trust, and declared she could not give up her child.

". . . Laban, I would be the happiest little girl in the world if I only knew I could come back to you. I do love you—you only—and will never look at another man again and raise Hortense just as you want me to. Remember it wasn't my fault—and I didn't do anything so indiscreet—honestly I never . . .

"You can never have another child like Hortense and neither can I. I would be willing to devote my entire life to raising a family—and Laban we no doubt could have a wonderful family judging from Hortense.

"Really Laban we kept too late hours— . . .

"Laban won't you please, please forgive and I'll put my whole life into you and Hortense.

"Oh, a line from you would help me wonderfully."

She seems to have been led to believe that if she did not resist a · divorce from her husband, Daugherty would likewise be divorced from Mrs. Daugherty, and that she could and should marry him. She wrote:

"Laban, don't you think I should marry Bill tho—because he is the only fellow if I have been untrue to—if you call it being untrue—since I have been married. I presume the safest way in this world to be on the square—is not to even look at another man."

To Mrs. Daugherty, she wrote:

"Yes I feel that 'Bill' and I should marry—if I were to marry some other fellow—and perhaps some day have Hortense—he never would love H like 'Bill' would. 'Bill' said he believe he tho't as much of H. as he would his only child and certainly would be good to her. . . .

" 'Bill' said if I didn't marry him—he didn't care what became of him."

It appears that the grounds on which plaintiff at first intended to base his claim to a divorce did not include the charge of adultery— merely neglect of duty, etc. But when the defendant had time to realize the extent of her sacrifice in being deprived of her child, she became unmanageable. Daugherty wrote to her:

"I am writing you this once, Helen, to get you to do right. If you expect & want to marry me as soon as we can then you must do as I say in this. I am

willing to do as I agreed with you dear, but positively will not if you persist and bring it to court. Why you wont gain a thing & in the end will be worse off. You would have your name and reputation ruined, no alimony, no Hortense & No chance of seeing her at all and no prospect with me. Not that I think you are madly in love with me, because you are not, but I believe we could be happy and have a good home. But not if it comes to court. I am through in that case."

Plaintiff and Daugherty made one or two trips to Quincy to reason with her and to get the child. In fact, one time they went together and met Mrs. Harmon. The plaintiff testified:

"Q. Now when you got there this seducer of your house was there? A. Yes.

"Q. And you all had a conference, didn't you? A. Yes, sir; we did.

"Q. Now what did you talk about? A. Talked about first about the custody of Hortense.

"Q. Yes, and you told your wife that unless she would give up that child you would publish to all her friends and go out and tell her parents that you caught her and Bill Daugherty in a compromising position? . . . A. I simply said if she wasn't satisfied with the agreement we three had made there together, that the only recourse she could have would be into the courts. And if it was carried into the court I would of course reserve the right to amend my petition and tell the truth.

"Q. Now was there anything that you people discussed up there with Bill Daugherty except the possession of that child and that child's future, and the mother's position. A. Yes, sir.

"Q. What was it? A. We discussed Mrs. Harmon and Mr. Daugherty's future. Mrs. Harmon said that her folks would be curious when Hortense was gone. They wouldn't know the truth. And that I couldn't expect to leave her without any alimony. That her parents would never understand, not knowing the cause of my divorce, why I didn't pay her alimony. And she said if I would pay her alimony until such time as she and Mr. Daugherty could get married, that her folks need never know. And I told her I was considerably in debt, and I was going to do all I could for her.

"Q. Why didn't you throw her a government bond, or something? A. I give her two fifty dollar government bonds. She said she was in need of clothes and out of money, and told her that I would give her fifty dollars a month, and Mr. Daugherty volunteered that he would give her $25.00 a month.

"Q. You didn't hit him then, did you? A. No, I didn't hit him."

Space forbids further details of this marital shipwreck. It has to be added, however, that Daugherty's seduction of plaintiff's wife did not alter in any noticeable degree the bosom-friend comradeship which had theretofore existed between plaintiff and Daugherty. He visited at Daugherty's, went riding with the Daughertys, and danced with Mrs. Daugherty, though less frequently. The two men co-

operated zealously to constrain the defendant not to make a fight in court for the custody of her child. They held before her the impending exposure of her shame before her parents and the public, but the mother instinct in defendant was not to be coerced, whatever the consequences.

To the foregoing much abridged narrative, gleaned from the abstract and counter-abstract, what shall we say to the plaintiff's contention that the trial court's finding of connivance is not supported by the evidence? His counsel cite cases to the effect that one spouse who suspects the other spouse of adultery may suffer the suspected one, in a single instance, to avail herself of an opportunity to indulge her adulterous disposition with no other motive than to obtain proof of her delinquency which would entitle him to a divorce, and that such conduct on his part is not connivance. Undoubtedly that proposition is good law. (*Wilson v. Wilson*, 154 Mass. 194, 12 L. R. A. 524, and notes; 19 C. J. 89, 91, and notes; 9 R. C. L. 394.) But it does not appear that the trial court based its finding of plaintiff's connivance in this case upon the conduct of the plaintiff on the night when he discovered his wife in adultery—the announcement that he and Mrs. Daugherty were going for a ride, their circuit of the block in the automobile, the opportunity thereby given to the delinquents, and its consequences. The connivance as shown by the evidence began long before that incident. The persistent and unusual intimacy of these four young people, the late hours, the night rides, plaintiff with Daugherty's wife, defendant with Daugherty, the sex-instinct-arousing dances and embraces in the dark, in all of which plaintiff acquiesced, and to which his similar conduct gave passive assent, if not encouragement—these and the other incidents above led to the overthrow of his wife's marital fidelity. This course of conduct may not inaptly be designated as a form of connivance; at least it is persuasive evidence from which a finding of connivance can be deduced. Plaintiff testified that it never occurred to him that in taking the many night auto rides with Bonnie, leaving defendant and Bill to their own devices, taking his wife every other night to Daugherty's house to dance with and embrace Bill in the dark and to go riding with Bill while he himself similarly and alternately danced and went night riding with Bonnie, and receiving the Daughertys on alternate nights in plaintiff's home for similar practices—notwithstanding all these matters it never occurred to him that he

was leading his wife into temptation and giving Daugherty most unusual opportunities for her seduction. The trial court was not bound to believe such testimony. No doubt there are such guileless and unsuspecting simpletons in the world, but they are hardly to be found among men of plaintiff's intelligence and business and social standing. Plaintiff cannot be heard to say that he did not know the conventional standards of right conduct which respectable society has reared and crystallized into a moral code to guide and keep its members in the path of virtue; and it is neither cant nor preaching to say that plaintiff himself persistently violated that code when night after night he left his wife with Bill Daugherty while he and Bonnie Daugherty waltzed in the dark and went auto riding and otherwise gave her the example which led to her infidelity. He knew his wife better than anybody. She was the mother of his child. He must have known that the absurd lengths to which his extraordinary intimacy, informality and unconventionality with the Daughertys had grown, as well as defendant's, was bound to culminate in some such manner as it did. As was said in *Wilson v. Wilson*, supra, the husband—

"Must not, however, make opportunities for her, though he may leave her free to follow opportunities which she has herself made. He is not obliged to throw obstacles in her way, but he must not smooth her path to the adulterous bed." (p. 196.) (See, also, *Noyes v. Noyes*, 194 Mass. 20; 10 Ann. Cas. 818 and notes, 120 A. S. R. 517 and notes.)

Moreover, the trial court was constrained to take an unfavorable view of plaintiff's antecedent conduct from his continued association and comradeship with Daugherty after the discovery of the episode which established the guilt of his wife. But even if plaintiff's course of conduct be not precisely characterized as connivance, it was altogether inconsistent with that freedom from fault which would compel a reversal of the judgment. Without narrowing the effect of the undisputed evidence to the finding of connivance, we cannot hold that a divorce was erroneously denied. There are three parties to every marriage and to every divorce—the man, the woman, and the state itself. As said in *Dennis v. Dennis*, 68 Conn. 186, 34 L. R. A. 459:

"As the state favors marriages . . . so the state does not favor divorces, and only permits a divorce to be granted when those conditions are found to exist, in respect to one or the other of the married parties, which seem to the legislature to make it probable that the interests of society will be better

served, and that parties will be happier, and so the better citizens, separate, than if compelled to remain together. The state allows divorces, not as a punishment to the offending party nor as a favor to the innocent party, but because the state believes its own prosperity will thereby be promoted." (p. 197.)

Whether or not the plaintiff's course of conduct which the trial court declared to be connivance was properly so defined, this record will not warrant this court in holding that the divorce was erroneously denied; and a debatable reason for a judgment or a debatable finding of fact is not of controlling importance when from the whole record this court is assured that the judment itself is correct. (Civ. Code, § 581.). In *Fitzgerald v. Realty Co.,* 106 Kan. 54, 186 Pac. 738, where this court approved a judgment, it was said: "The fact that the [trial court's] reason given for the ruling does not meet the approval of this court affords no ground for reversal." (p. 56.)

Another error assigned is urged: A witness had testified without objection that from her observation and acquaintance with defendant, the latter was a fit person to have the custody of her daughter; but the trial court sustained an objection to a question on cross-examination:

"Q. Now Mrs. Lowry, if it should be a fact that Mrs. Harmon has been guilty of intimate or adulterous relations with a married man other than her husband, would you regard her as a proper person to rear her child?"

A similar question put to the Presbyterian minister who had testified for the defendant was similarly ruled out.

This is of little consequence. We do not find this excluded testimony brought on the record in support of the motion for a new trial, which renders it still less important. (*Scott v. King*, 96 Kan. 561, 566, 567, 152 Pac. 653; *The State v. Ball*, 110 Kan. 428, 432, 433, 204 Pac. 701.) What response these witnesses would make to such a question could be of very little assistance to the court. Mayhap the woman would have answered in the negative; and the preacher with a broader and more tolerant outlook on the frailties of humanity would have answered that if the erring mother had repented of her sin and was sincerely determined to amend, such a lapse from the path of virtue would not disqualify her from faithfully rearing her child in the path of rectitude. But whatever response the witnesses might have made, there were all sorts of evidence that except for defendant's temporary infatuation for her paramour, she was a good mother; and moreover, while the evidence does not show nor hint—

and we have no inclination to infer—that plaintiff's infatuation for Mrs. Daugherty had extended to a similar infidelity, yet his persistent habit of dancing in the dark and auto riding with another man's wife, and his affected innocence or blunted sense of the impropriety in such conduct, left it far from clear that the child—and that child a daughter, too—would be any better off in his care than in its mother's care. The court's order is only temporary. If it transpires that the mother has not mended her ways—and if the father does not develop a better sense of how to occupy his leisure time, it may be necessary for the court, charged as it is with the discretionary exercise of the state's power as *parens patriæ*, to deprive both of its custody, and bestow it upon someone who can better appreciate and discharge a parent's responsibilities.

We note a protest in plaintiff's reply brief touching the defendant's unduly extended counter-abstract. At this late day, the proper way to bring that matter before the court is by a motion to retax costs.

The record contains no error, and the judgment is affirmed.

BURCH, J., dissents from the first paragraph of the syllabus and corresponding portion of the opinion.