(No. 6564. July 30, 1938.)

HAZEL I. KRIEGER, Appellant, v. BENNIE P. KRIEGER, Respondent.

[81 Pac. (2d) 1081.]

302

J. H. Felton, for Appellant.

Murray Estes, for Respondent.

AILSHIE, J.—Appellant and respondent intermarried at Weiser in 1928 and for three years thereafter lived on a farm near Midvale. They later moved to Troy where respondent was engaged in driving a logging truck. In the fall of 1936, appellant, over the protest of respondent, accepted employment cooking in a logging camp for one, John Hager, at Helmer. The minor child of the parties was left in the father's care in the meantime. Early in May appellant, being ill, was taken to the hospital. June 2, 1937, she filed action for divorce on the ground of cruelty; decree was granted July 17th, awarding appellant a decree of divorce from respondent and awarding to respondent the custody of their minor child, Claire Arlene Krieger. Thereafter, appellant, in the company of Hager, left for Camas, Washington, where she resided until August 10, 1937. August 6th she married Hager and they later moved to a farm near Nampa owned by appellant's parents. They were still living there December 13, 1937, when this motion was made, at which time the child was eight years old. Appellant did not see her daughter from July 18th until a short time prior to the trial.

This motion was made for a modification of the decree, awarding the custody of the child to respondent. Trial was had December 23d and January 7th following the court entered its order amending its former decree by adding the following words: "Provided, however, that the plaintiff, Hazel I. Krieger, may visit said minor child at the home of said defendant at any reasonable time or hour." From this order the present appeal is prosecuted.

Appellant's testimony discloses that there was an agreement between husband and wife that the child would be taken

to his folks in Boise, to live there and go to school. Appellant was ill at the time and unable to take care of the child. Respondent was not in favor of the divorce but insisted on taking the child. After returning to Idaho, in the fall of 1937, appellant visited at the Knapik farm near Troy, where respondent and the little girl were living in an unfinished upstairs apartment, with unpapered walls, no rugs on the floor and no curtains at windows. Appellant imagined that it was a place that "would get afire." In comparison she described her home near Nampa, as a large two-story house with eight rooms, plastered and finished with calcimine, electric lights; having a large lawn around it and trees, "a nice country home." She testified that she had always sewed for her little girl; that it was a great pleasure and that the child had never worn a ready-made garment. She sent clothing to the child but they were returned; that the father wouldn't allow her to send a gift to the child at Christmas; that he said he would like to burn all she had made for the child so that "he would never have to see her wear it." Before bringing action for divorce, appellant, at respondent's instance and request, wrote a letter to his parents in which she informed them that Krieger and she had separated; that it wasn't his fault and that he had always been good to her in every way; that he had the baby and she couldn't be mean enough to take her from him. Respondent admitted that he had asked appellant to write such a letter, so that "they would know the truth about it."

As to appellant's fitness and ability to care for her little girl: A Mrs. Oslund, principal of the grade school at Troy, testified that she took care of the Krieger child from November to May, while appellant was working. The father paid for one month and the mother gave her a check and cash; she did "not know whose money it was." At a prior time appellant had taken care of her own child and Mrs. Oslund's boy and Mrs. Oslund "was more than pleased with her work" and what she did for her child; that appellant came up to sew and fix the clothes; that she had "seen or heard nothing to the contrary" as to appellant's fitness to have the child's custody; that the child "didn't look neglected

by any means, just a nice appearing girl and . . . . well dressed."

Mrs. Banks, in whose upstairs apartments the Kriegers lived when they first moved to Troy, took care of the Krieger child for about a month while the mother was working. The latter made arrangements with Mrs. Banks to get the child over the week-ends, but she did not come to see the child during that time. Ray Rauch, respondent's employer at Troy, testified that his family had Thanksgiving dinner at the Kriegers and that "they [the latter] had both worked very hard to get it fixed."

As to the ability and fitness of respondent to care for his little girl, the following testimony is found: Respondent testified that he took the child down to his folks in Boise in May and left her there until the latter part of June; brought her up with him the 14th of July and they lived at Elk River with Mr. and Mrs. Altmaier, whom respondent also brought from Boise. They later moved to Cornwall. Mrs. Altmaier kept house for Mr. Krieger and her own family. As to the type of food supplied, she testified that she had anything she wanted to cook. "All I have to do is tell them what I need and they get me the groceries. . . . . Just common ordinary food, just what children need." She also testified to the "real good grades" respondent's child received in school at Cornwall.

Mrs. Banks testified that "Mr. Krieger was a very good father." Respondent's employer, Rauch, said: "Ben Krieger was a very good worker. I am quite sure that Ben would take care of her [the child] to the best of his ability." Frank Rowan, resident of Troy for 31 years, testified as to Krieger's reputation as to moral character; that it was "good, splendid"; that he was a good worker, and would take care of the little girl "the best he possibly could." Knapik, another employer of Krieger, also testified that respondent was a good worker and "couldn't see where she [Krieger child] could have any better care."

Claire Krieger, whose custody is sought by appellant, was placed on the witness stand and testified that she lived with her daddy; that he came home every night; that Mrs. Altmaier took care of her and she liked her, liked her teacher

and got along fine in school. She said she liked her daddy and mama both but when asked the following question: "Do you care who you live with, Claire, whether it is your daddy or your mama?", she replied: "I would like to live with my daddy better, I think." It should be observed just here that this kind of examination of an eight year old child, in the presence of its parents, is hardly fair to the child. If such an examination is thought proper at all, it should take place out of the presence and hearing of the parents so as to save the child the embarrassment and possible fear of expressing a preference between the father and mother. (*Andrino v. Yates*, 12 Ida. 618, 623, 624, 87 Pac. 787.)

The trial court found, as a conclusion of law, "that plaintiff is not a fit and proper person to have the care and custody of the minor child of the parties," and further found, as a conclusion of law, "That defendant, Bennie P. Krieger, is entitled to retain the absolute care, custody and control of the minor child of said parties." Neither the findings of fact nor the evidence adduced supports either of these conclusions. There is nothing in the record to support the conclusion that this mother is an unfit person to have the care and custody of her eight year old daughter nor is there any evidence that the father is an unfit person to have her custody. On the other hand, a finding or conclusion that one or the other of the parents "is entitled to retain the absolute care, custody and control" of the child, is beside the issue for the reason that the paramount issue in this proceeding is not the respective rights of the parents, which have already been litigated in the main (divorce) action, but rather the *welfare of the child*. The child's welfare as a normal human being and future citizen is the polar star by which the court must be guided in awarding its custody. (*Kirkpatrick v. Kirkpatrick*, 52 Ida. 27, 10 Pac. (2d) 1057; *Ruthruff v. Ruthruff*, 52 Ida. 330, 14 Pac. (2d) 958; *Cornelison v. Cornelison*, 53 Ida. 266, 23 Pac. (2d) 252; *Andrino v. Yates, supra*.) For discussion of the same issues as are dealt with in the last cited cases and to the same effect, see *Kenner v. Kenner*, 139 Tenn. 211, 201 S. W. 779, L. R. A. 1918E, 587, 590; *Harmon v. Harmon*, 264 Ky. 315, 94 S. W.

(2d) 670, 672; *Pressey v. Pressey,* 184 Wash. 191, 50 Pac. (2d) 891.

It is the established rule of this court, and other courts as well, that, all other considerations being equal, a child of tender age or a girl of even more mature years can and will be reared, trained and cared for best by its mother. This conclusion needs no argument to support it because it arises out of the very nature and instincts of motherhood; nature has ordained it.

It appears that in the trial court respondent turned his chief attention to an inquiry into the conduct of appellant immediately prior and subsequent to the granting of the divorce, and particularly with reference to her employment by Hager, the man whom she subsequently married and with whom she went away to Washington a few days after the granting of the decree. Clearly her conduct prior to the entry of the decree and which would have had a bearing upon the issue as to whether she was entitled to a decree of divorce is not an issue on this hearing. Her subsequent conduct of course was a proper subject of inquiry in so far as it bears upon her fitness to have the care, custody and education of this child. In that respect, however, nothing has been adduced against her, unless it be said that the fact that she remarried within some three weeks after the granting of the decree might be considered a circumstance against her fitness to care for and train her minor child. To this proposition we cannot give our assent. If such were the law, it would certainly disqualify a multitude of mothers in this country, who remarry, from subsequently having the care and custody of minor children as issue of the previous marriage. It would leave too many orphans. Such conduct may be ethically the subject of gossip, censure and disapproval but it is certainly not a circumstance which disqualifies a mother for the care and training of her child. (Keezer on Marriage and Divorce, sec. 587; *Vickers v. Faubion,* (Tex. Civ. App.) 224 S. W. 803, at 807; *Harmon v. Harmon,* 111 Kan. 786, 208 Pac. 647, at 651.)

In the case before us it may be safely asserted that the record shows both these parties are honest, industrious and well-behaved. So far as their moral and physical fitness

for taking care of this child is concerned, there is no doubt in our minds. This brings us to the one paramount inquiry, that is, the welfare of the child. If appellant has a home provided such as described by her in her testimony and continues to maintain the same with surroundings and school facilities described by her, it would seem that, under such circumstances, the child would be much better off in the custody of the mother. The child is bound to suffer more or less from a change back and forth from one community to another and one school to another during the school year. That contingency should be avoided if, and in so far as, possible.

In view of the findings as hereinbefore indicated and the evidence introduced, we have concluded that the matter should be remanded to the trial court for further hearing. It will be unnecessary to again take the testimony of the witnesses who have been examined, unless the parties desire to further question them. We suggest that the court permit either side to introduce any further proof he or she may desire to submit and thereupon make further findings and enter an order in accordance therewith. We may add that whatever order the court makes should contain a provision to the same effect as that contained in the order appealed from with regard to the adverse party being allowed to visit the child at all reasonable times. Of course whatever order may be made will still be subject to modification and change at any time conditions and circumstances may seem to require doing so, in order to best serve and protect the child. Costs awarded to appellant.

Holden, C. J., and Givens, J., concur.

MORGAN, J., Dissenting.—The parties to this action were divorced July 17, 1937, and in the decree the custody of their daughter was awarded to the father, who is respondent here. December 13, 1937, appellant, the mother of the child, moved the district court for an order modifying the decree and awarding the custody of the child to her. A trial was had resulting in findings of fact and conclusions of law and an order. The conclusions are as follows:

"I. That the defendant, Bennie P. Krieger, is entitled to retain the absolute care, custody and control of the minor child of said parties hereto, Claire Arlene Krieger, save and except that said decree should be so amended as to provide that the plaintiff, Hazel I. Krieger, may visit said minor child at reasonable times and hours at the home of the said Bennie P. Krieger.

"II. That plaintiff is not a fit and proper person to have the care and custody of the minor child of the parties.

"Dated this 7th day of January, 1938."

The court ordered that the decree of divorce be amended by adding the following:

"Provided, however, that the plaintiff, Hazel I. Krieger, may visit said minor child at the home of said defendant at any reasonable time or hour."

This appeal is from the order, and appellant complains of the action of the district court in refusing to award the custody of the child to her.

May 31, 1937, appellant wrote the following letter to respondent's parents, which is set out in full in the findings of fact. The action for divorce was commenced June 2, 1937.

"Moscow, Idaho
"May 31, 1937

"Dear Folks:

"I suppose you think I am never going to answer your letter but at last I am.

"How are all of you? Well, I hope.

"I am getting along fine. Am still pretty nervous but will be o. k. in time I guess.

"Well, I have something to tell you.

"Bennie and I have separated. It isn't any of his fault. He has always been good to me in every way. He has the baby but has promised to let me see her when ever I wish. I am writing to tell you to spare him a little so please don't ask him questions or talk about it as it will only hurt him more.

"One other thing I would like to ask of you if I may, that is not to talk to baby about me as it will hurt her too, and she still loves me some. I love her with all my

heart but I can't be mean enough to take her from her Daddy even if I could.

"Bennie wants me to tell you everything, so altho it takes a lot of nerve, and I still have some pride I'll do it. I haven't loved him for a good long time. He doesn't believe that, but he wants me to tell you the truth so there it is.

"Some place in this world there is a true mate for each of us and I have found mine.

"Now, think what you will of me, but I have been honest in telling him at last, and only regret I didn't do it several years ago, but have always thot if you make your bed, lie in it.

"Well, there isn't much more to say, so will close.

As Ever<br>HAZEL"

As above stated, the decree of divorce was granted July 17, 1937, and immediately therafter appellant left in company with John F. Hager. They went into the state of Washington, where, August 6, 1937, they were married.

This closely coupled train of events leads to the inevitable conclusion that appellant referred to the man who was then her lover and is now her husband when she wrote, "Some place in this world there is a true mate for each of us and I have found mine."

Referring to appellant's conduct, disclosed by this record, it is said in the foregoing opinion: "Such conduct may be ethically the subject of gossip, censure and disapproval but it is certainly not a circumstance which disqualifies a mother for the care and training of her child." I do not subscribe to that doctrine. Such conduct is violative of the public policy of Idaho, expressed in I. C. A., sec. 31–207, as follows:

"A subsequent marriage contracted by any person during the life of a former husband or wife of such person, with any person other than such former husband or wife, is illegal and void from the beginning unless:

"1. The former marriage of either party has been annulled or dissolved more than six months; . . . . "

While such conduct may raise debatable questions of criminal law, there should be no difference of judicial opinion when it is considered from the standpoint of good citizenship or of common decency.

I am in full accord with the time-honored rule expressed in the foregoing opinion to the effect that the well-being of the child should guide the court in determining who shall have its custody. This is not to be decided by determining which of the parents is best able, financially, to provide for the child, for plastered walls do not always make a home. The controlling questions, which were correctly decided by the district court in this case, are: Which of these parents is best suited to be the guardian of this child during the period of her minority? From whose custody will she emerge the better woman?

In answering these questions, it is well to have in mind that this girl is eight years old; that if custody of her is awarded to her mother, her stepfather will be the head of the family in which she must grow up and, although the majority of this court may be misled as to who broke up the little home in Troy, she will not be deceived about it. It follows, I think, that there is no chance for her to be happy, nor to develop into the high type of citizenship she has a right to and would attain in a better environment.

Nothing is to be gained by sending this case back for a new trial, for which neither party has asked. There is no likelihood that the taking of further testimony will improve the appearance of the miserable picture now before us. I am in favor of affirming the order appealed from.

BUDGE, J., Dissenting.—From an examination of the record in this case I cannot bring myself to concur in the majority opinion, reversing the judgment of the trial court, but feel thoroughly satisfied that the judgment should be sustained.